# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERESA BUCHANAN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-00041-SDD-EWD |
| | ) | |
| **F. KING ALEXANDER,** *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CONSOLIDATED MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AND OPPOSITION TO DEFENDANTS' MOTIONS FOR
## <u>SUMMARY JUDGMENT AND  JUDGMENT ON THE PLEADINGS</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

    A.   Complaints About Dr. Buchanan ...........................................................2

    B.   LSU's Response to Complaints About Dr. Buchanan ...........................5

          1.   Investigation and Findings ........................................................6

          2.   Decision to Seek Dismissal For Cause ......................................8

          3.   PS-104 Hearing .......................................................................10

          4.   Alexander's Rejection of the Committee's Recommendation...11

          5.   Board of Supervisors Decision .................................................12

ARGUMENT ....................................................................................................12

I.     DR. BUCHANAN'S TERMINATION VIOLATED THE FIRST AMENDMENT ........12

    A.   The First Amendment Protects Academic Freedom and Limits
         Anti-Harassment Policies...........................................................12

    B.   LSU's Sexual Harassment Policies Are Facially Invalid .....................17

    C.   LSU's Sexual Harassment Policies Were Applied Unconstitutionally ................20

II.    BUCHANAN'S TERMINATION VIOLATED DUE PROCESS....................................23

III.   DEFENDANTS CANNOT CLAIM IMMUNITY .................................................26

IV.   MISCELLANEOUS DEFENSES ....................................................................29

    A.   The Court Can Provide Effective Relief ...............................................29

    B.   Plaintiff's Claims Are Not Time-Barred ...............................................29

CONCLUSION....................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Trustees of Univ. of N.C.-Wilmington*,
   640 F.3d 550 (4th Cir. 2011) ............................................................................13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................1

*Bair v. Shippensburg Univ.*,
   280 F.Supp.2d 357, 372 (M.D. Pa. 2003) ........................................................17

*Beattie v. Madison County School District*,
   254 F.3d 595 (5th Cir. 2001) ......................................................................15, 28

*Board of Regents of State Colls. v. Roth*,
   408 U.S. 564 (1972)......................................................................................17, 23

*Clements v. Airport Auth. of Washoe Cty.*,
   69 F.3d 321 (9th Cir. 1995) ........................................................................23, 25

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985)..............................................................................23, 25, 26

*Cohen v. San Bernardino Valley Coll.*,
   92 F.3d 968 (9th Cir. 1996) ..............................................................................17

*College Republicans at San. Fran. St. Univ. v. Reed*,
   523 F.Supp.2d 1005 (N.D. Cal. 2007) ..............................................................19

*Culbertson v. Lykos*,
   790 F.3d 608 (5th Cir. 2015) ............................................................................28

*Cutter v. Stephen F. Austin State Univ.*,
   767 F.3d 462 (5th Cir. 2014) ......................................................................14, 26

*Dalley v. Vought Aircraft Co.*,
   141 F.3d 224 (5th Cir. 1998) ............................................................................26

*Dambrot v. Central Mich. Univ.*,
   55 F.3d 1177 (6th Cir. 1995) ............................................................................19

*Davis v. McKinney*,
   518 F.3d 304 (5th Cir. 2008) ............................................................................14

*Davis v. Monroe County Bd. of Educ.*,
  526 U.S. 629 (1999)...............................................................................6, 12, 16

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,
  51 F.3d 591 (5th Cir. 1995) ........................................................................16, 17

*DeJohn v. Temple Univ.*,
  537 F.3d 301 (3d Cir. 2008)............................................................16, 18, 19, 27

*Demers v. Austin*,
  746 F.3d 402 (9th Cir. 2014) ......................................................................13, 27

*EEOC v. Boh Bros. Constr. Co.*,
  731 F.3d 444 (5th Cir. 2013) ..............................................................................19

*Esfeller v. O'Keefe*,
  391 F. App'x 337 (5th Cir. 2010) ................................................................17, 18

*Ex parte Young*,
  209 U.S. 123 (1908).............................................................................................26

*Freeman v. Gore*,
  483 F.3d 404 (5th Cir. 2007) ..............................................................................28

*Gamel v. Grant Prideco, L.P.*,
  625 F. App'x 690 (5th Cir. 2015) ..........................................................................1

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006).................................................................................13, 14, 27

*Hardesty v. Cochran*,
  621 F. App'x 771 (5th Cir. 2015) ...................................................................26, 27

*Hardy v. Jefferson Cmty. Coll.*,
  260 F.3d 671 (6th Cir. 2001) ........................................................................14, 15

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982).............................................................................................28

*Harris v. City of Hammond*,
  2008 WL 4469112 (E.D. La. 2008) ....................................................................15

*Hope v. Pelzer*,
  536 U.S. 730 (2002).............................................................................................27

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
  993 F.2d 386 (4th Cir. 1993) ..............................................................................19

*Jett v. Dallas Indep. Sch. Dist.*,
    798 F.2d 748 (5th Cir. 1986) ............................................................................28

*Johnson v. Owens*,
    612 F. App'x 707 (5th Cir. 2015) ....................................................................1

*Jones v. La. Bd. of Supervisors of Univ. of La. Sys.*,
    809 F.3d 231 (5th Cir. 2015) ..........................................................................23

*Kaprelian v. Texas Woman's Univ.*,
    509 F.2d 133 (5th Cir. 1975) ....................................................................14, 15

*Keefe v. Geanakos*,
    418 F.2d 359 (1st Cir. 1969) ....................................................................14, 15

*Kerr v. Hurd*,
    694 F.Supp.2d 817 (S.D. Ohio 2010) ............................................................27

*Keyishian v. Board of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967)...........................................................................13, 15, 27

*Kingsville Indep. Sch. Dist. v. Cooper*,
    611 F.2d 1109 (5th Cir. 1980) ........................................................14, 15, 27, 29

*Levitt v. Univ. of Texas at El Paso*,
    759 F.2d 1224 (5th Cir. 1985) ........................................................................23

*Martin v. Parrish*,
    805 F.2d 583 (5th Cir. 1986) ..........................................................................14

*McCauley v. Univ. of V.I.*,
    618 F.3d 232 (3d Cir. 2010)......................................................................17, 18

*McClendon v. City of Columbia*,
    305 F.3d 314 (5th Cir. 2002) ..........................................................................28

*McCoy v. Michigan*,
    2007 WL 1098261 (E.D. Mich. Apr. 10, 2007), *aff'd in part, rev'd in part on*
    *other grounds*, 369 F. App'x 646 (6th Cir. 2010).................................................25

*McDonnell v. Estelle*,
    666 F.2d 246 (5th Cir. 1982) ............................................................................1

*Miller v. Johnson*,
    515 U.S. 900 (1995).......................................................................................19

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977)..................................................................................14, 15

*New Orleans Towing Ass'n v. Foster*,
    248 F.3d 1143 (5th Cir. 2001) ....................................................................26

*Papish v. Board of Curators of Univ. of Mo.*,
    410 U.S. 667 (1973)....................................................................................18

*Pearson v. Callahan*,
    555 U.S. 223 (2009)....................................................................................26

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968)....................................................................................15

*Powers v. Northside Indep. Sch. Dist.*,
    143 F.Supp.3d 545 (W.D. Tex. 2015)..........................................................28

*Purvis v. Oest*,
    614 F.3d 713 (7th Cir. 2010) .......................................................................26

*Reeves v. Claiborne Cty. Bd. of Educ.*,
    828 F.2d 1096 (5th Cir. 1987) .....................................................................14

*Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*,
    605 F.3d 703 (9th Cir. 2010) ..................................................................17, 19

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001)........................................................16, 17, 18, 19

*Shelton v. Tucker*,
    364 U.S. 479 (1960)....................................................................................13

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)....................................................................................13

*United States v. St. Junius*,
    739 F.3d 193 (5th Cir. 2013) .......................................................................19

*United States v. Stevens*,
    559 U.S. 460 (2010)....................................................................................19

*UWM Post, Inc. v. Board of Regents*,
    774 F.Supp. 1163 (E.D. Wis. 1991).............................................................17

*Van Heerden v. Board of Supervisors of Louisiana State Univ.*,
    2011 WL 5008410 (M.D. La. Oct. 20, 2011) ...............................................29

*Williams v. Dallas Independent School District*,
    480 F.3d 689 (5th Cir. 2007) ..................................................................13, 14

**Constitutional Provisions**

U.S.. Const. amend. I ................................................................................................. *passim*

U.S. Const. amend. XI .............................................................................................26

U.S. Const. amend. XIV ..........................................................................................23

**Rules**

Federal Rules of Civil Procedure 12(c) ....................................................................1

Federal Rules of Civil Procedure 12(d) ...................................................................1

Federal Rules of Civil Procedure 56 ........................................................................1

**Other Authorities**

http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf ...................19

http://www2.ed.gov/print/about/offices/list/ocr/ firstamend.html .............................19

www.justice.gov/sites/default/files/opa/legacy/ 2013/05/09/um-ltr-findings.pdf .........18

Plaintiff Dr. Teresa Buchanan hereby moves for summary judgment and opposes Defendants' Motions for Judgment on the Pleadings (Dkt. 26) and for Summary Judgment (Dkt. 30) ("Def. Mot.").[1]  For the reasons that follow, the Court should grant summary judgment to Dr. Buchanan and deny the Defendants' motions because there is no genuine issue of material fact, and she is entitled to judgment as a matter of law on her constitutional claims.  *Johnson v. Owens*, 612 F. App'x 707, 710 (5th Cir. 2015) (*per curiam*).

## INTRODUCTION

This is a case of political correctness run amok.  The Defendants at Louisiana State University ("LSU") fired Dr. Teresa Buchanan, a tenured and respected professor of early childhood education, for "sexual harassment" based on speech having nothing to do with either "sex" or "harassment."  They did so because of a botched implementation of a federal "blueprint" to prevent harassment and through application of poorly drafted policies that ignore First Amendment limits to regulating academic speech.  Defendants followed a process "akin to the child's game of 'telephone,' in which a message is repeated from one person to another," such that, "after some time, the message bears little resemblance to what was originally spoken." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 264-65 (1986) (Brennan, J., dissenting).  Vague charges were made, repeated, and recycled until – in the end – not even Dr. Buchanan's accusers could say what she did that justified her termination.  Neither the First Amendment nor the Due Process Clause permit such an assault on basic rights.

---

[1]  As noted in the Motion that this Memorandum supports, Defendants filed substantially identical motions under F.R.C.P. 12(c) and F.R.C.P. 56, with the effect of converting the former into a Rule 56 motion. *See* F.R.C.P. 12(d); *Gamel v. Grant Prideco, L.P.*, 625 F. App'x 690, 693 (5th Cir. 2015); *McDonnell v. Estelle*, 666 F.2d 246, 250 (5th Cir. 1982).  While Plaintiff responds here to both motions, we cite only the summary judgment motion.

## BACKGROUND

Professor Teresa Buchanan had been on the faculty of the Louisiana State University School of Education since 1995, and was promoted to Associate Professor with tenure in 2001. SUMF ¶¶ 1-3.  She created LSU's renowned "Early Childhood Program," a teacher education program for pre-school through third-grade instruction known as the "PK-3" program, *id.* ¶¶ 10-12, was widely published in top academic journals, and had demonstrated significant success in securing funding for her research and for early childhood initiatives at LSU.  *Id.* ¶¶ 4-9.  Before the events that led to her termination, Buchanan had been recommended for promotion to Full Professor in 2013 following a rigorous review process that included the approvals of a Tenure and Promotion Committee, the Director of the School of Education, and the Dean of the College of Human Sciences and Education, Defendant Damon Andrew.  *Id.* ¶¶ 13-15.

### A.    Complaints About Dr. Buchanan

Around the time Andrew signed off on Buchanan's promotion in mid-November 2013, Ed Cancienne, the Superintendent of the Iberville Parish Schools District, complained about Buchanan's "professionalism and her behavior" during her site visits to schools in his district as part of her oversight of the PK-3 program.  SUMF ¶¶ 16-18.  Cancienne was "very upset" because "he had heard" that Buchanan had been "condescending to the teachers" during her site visits with LSU student teachers and their mentor teachers.  *Id.* ¶¶ 18-21.  When Dr. Buchanan learned of the complaint, she sought to smooth Cancienne's ruffled feathers by email the same day, apologizing for causing offense and affirming that the PK-3 program was "happy to be placing student teachers in the Iberville parish," and that his parish was "full of excellent teachers and very bright students."  *Id.* ¶ 24.  But Cancienne was not mollified.  He somehow

obtained Buchanan's personal cell phone number and called to complain, demanding that she "come to his office, and … sit down and have a long conversation, just the two of us."[2]

Whatever else may have been going on with him, Cancienne's principal complaint was he believed Dr. Buchanan had criticized him and his teachers. After Cancienne called Buchanan a second time, *id.* ¶ 26, Buchanan emailed him to apologize "for my blunt remarks that caused you offense," and offered to "send different supervisors for our students in your parish." *Id*. ¶ 27. Later that afternoon, an irate Cancienne called Curry to complain that he had heard from teachers in one of his schools that at a meeting there to assess a PK-3 program student teacher, Buchanan referred to Cancienne as "crazy," "talked awful about our schools," and said "pussy three times." *Id*. ¶ 28.[3]

Although this use of the word "pussy" was later used as part of LSU's primary evidence in terminating Dr. Buchanan, Cancienne never imagined the word was used in a sexual context, and he never considered her language to constitute sexual harassment. SUMF ¶ 39 ("Well, I didn't say anything about sexual harassment."). Instead, the context of the report Cancienne sent to LSU indicated that Dr. Buchanan's use of language was part of her effort to instruct student teachers how to cope with parents who may employ a different vocabulary from their own.

---

[2] *Id.* ¶ 25. Buchanan was reluctant to meet with Cancienne alone, and had previously told Associate Dean Jennifer Curry that Cancienne had "flirted with her," and that she found him to be "creepy." *Id.* ¶ 22. Curry responded, "And do I ever know what you mean by the creepiness factor!" and recommended that Buchanan email Cancienne so as to avoid interacting with him even by phone. *Id.* ¶¶ 22-23. This assessment of Cancienne was shared by a third female LSU faculty member. *Id*. ¶ 23 ("He seemed really fixated on Terry.… it's kind of creepy."). Gaston Reinoso, LSU's Human Resources Director, said there had been a suggestion that Cancienne had sexually harassed Dr. Buchanan. *Id.* ¶ 83. At his deposition, Cancienne (who did not appear with counsel), insisted on suspending the proceeding until Plaintiff stipulated on the record, that she would not sue Iberville Parish or Cancienne on any issue related to her suit, including any sexual harassment claim. Tab 4, Cancienne Tr. 60:17-76:4.

[3] Cancienne told Curry that if Buchanan returned to Iberville schools he would "have her arrested." SUMF ¶ 29. *See also* Tab 4, Cancienne Tr. 89:21-90:4 ("[A]pparently she referred to me as the crazy superintendent, you know. She made that statement in front of other teachers." Q: "Is that something to call the sheriff over?" A: "Well, when I didn't want her in the school system, I wanted to say that, you know, I didn't know if she would be coming in or not. So, I mean, there have been occasions that I've called the sheriff about certain individuals.").

Tab 25 ("Dr. Buchanan used the word 'pussy' at least three times during the meeting when referring to the community of a school, and the everyday language of the parents of our students.").[4]   According to Cancienne, his greatest concern was that Buchanan had "hurt the culture … of the school," by "speaking negatively about faculty members."   SUMF ¶ 35.   He testified that he believed Buchanan's alleged use of the word "pussy" was "inappropriate" because she criticized the "vision and mission" of the school, but acknowledged he did not know the context for the remark "[b]ecause I was not present at the meeting."   *Id*. ¶ 38.

No one at LSU knew – or ever inquired into – the actual nature of Cancienne's concerns, or whether they had any conceivable connection to sexual harassment.   *Id.* ¶ 42.   Investigators never talked to Cancienne about his complaint, and simply assumed the word "pussy" was used as a sexual reference.   *Id*.   Dean Andrew testified that the report of Buchanan's use of the word "pussy," and not any of Cancienne's other complaints, was proof of "inappropriate" language. *Id*. ¶ 37.   Although he acknowledged any sexual connotation would depend on the context in which the word was used, he simply assumed Cancienne would not have complained if the word had been used appropriately.   *Id*.   Defendants A.G. Monaco, Associate Vice Chancellor of the Office of Human Resource Management, and President F. King Alexander likewise made no inquiry, and simply assumed Buchanan's use was slang for female genitalia.   *Id*. ¶ 43.

During the same time period, LSU collected three student complaints regarding Buchanan.   One student in the PK-3 program alleged Buchanan had told students it was unacceptable to get pregnant while in the program, supposedly offered to help them obtain condoms, and criticized one of the student's projects by questioning whether she would be able to repeat the project without the assistance of her boyfriend who may only be "supportive now

---

[4] SUMF ¶ 40.   Cancienne confirmed that the assessment team meeting in which the language was allegedly employed was attended only by adults, and that "only teachers would be in there, and master teachers."   *Id*. ¶ 34.

while the sex is good." SUMF ¶¶ 44-45. A second student claimed Buchanan had recorded her crying during an assessment meeting. *Id*. ¶ 46. No administrator met with Buchanan to discuss these allegations in fall 2013, nor did they disclose them to her. *Id*. ¶ 48. One of them later obtained correspondence from winter 2012, however, purporting to represent views of Buchanan's "Junior PK-3 Cohort" complaining that she "made several inappropriate and offensive comments," including saying "that a woman is thought to be a dike if she wears brown pants," that "it was a choice to be in the program and it was not the fault or problem of the professors if any of us chose to be mommies or wives and not to expect to get an A in the class," and that Buchanan used "extreme profanity on a regular basis."[5]

###    B.    LSU's Response to Complaints About Dr. Buchanan

After becoming aware of the complaints, Dean Andrew removed Buchanan from the classroom for the spring 2014 semester while the Office of Human Resource Management ("HRM") investigated the allegations. He based this on "inappropriate statements" allegedly made to "students, teachers, and education administrators," and for being "banned from the Iberville Parish campuses by the superintendent."[6] Andrew wrote that HRM would investigate what, if any, policies had been violated by these offenses "including the Sexual Harassment policy."[7]

LSU policy PS-73 defines sexual harassment as "speech and/or conduct of a sexually discriminatory nature, which was neither welcomed nor encouraged, which would be so

---

[5] SUMF ¶ 49. It was never established the letter actually came from a "cohort" and was not just a random complaint from a disgruntled student. *Id.* ¶¶ 50-51. The letter was transmitted by a student who purported to speak for her entire class, but there was no documentation she wrote on anyone else's behalf. *Id.* No LSU administrator spoke to anyone from the 16-member cohort. *Id.* Another faculty member believed the letter came from a "small group" that complained "how hard the work was" and that "Buchanan wouldn't cut them any slack." *Id.* ¶ 52.

[6] SUMF ¶ 53. Dean Andrew did not provide Buchanan with instructions to correct her performance, and did not ask anyone else to do so, including School of Education Director Cheek. *Id.* ¶ 54.

[7] SUMF ¶ 53. Although the HRM investigation was only beginning and had not yet rendered any findings, Andrew withdrew his support for Buchanan's promotion. *Id.* ¶¶ 55-56, 58. This led to a negative recommendation from President Alexander, which effectively ended Buchanan's prospects for promotion. *Id.* ¶¶ 59-60.

offensive to a reasonable person as to create an abusive working or learning environment and/or impair his/her performance on the job or in the classroom."  SUMF ¶ 62.  LSU's policy on sexual harassment of students, PS-95, defines sexual harassment as "unwelcome verbal, visual, or physical behavior of a sexual nature."  *Id.* ¶ 64.  It includes *quid pro quo* harassment and hostile environment harassment, which "has the purpose or effect of unreasonably interfering with an individual's academic, work, team or organization performance or creating an intimidating, hostile or offensive working environment."[8]  At the time of these events, LSU began interpreting these policies to mirror what the U.S. Departments of Education and Justice have called "a blueprint for colleges and universities" which defines sexual harassment broadly as "any unwelcome conduct of a sexual nature."[9]  Neither LSU policy nor the "blueprint" implements the standard articulated in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 652 (1999), which requires actionable harassment to be severe, pervasive, and objectively offensive.

### 1.    Investigation and Findings

Gaston Reinoso, LSU's Human Resources Director and Executive Director of Equal Employment Opportunity, conducted an investigation into whether Dr. Buchanan violated PS-73, PS-95, or other policies.  SUMF ¶ 73.  He prepared a 14-page report after interviewing the student complainants and a number of faculty members.  *Id.* ¶ 80.  However, he did not speak to any school superintendent, including Cancienne.  *Id.* ¶ 74.  Most of the report merely summarized the interviews, regardless of whether the details contributed to his ultimate finding that

---

[8] SUMF ¶ 66.  PS-95 lists examples of hostile environment harassment, including, "unwelcome touching or suggestive comments, offensive language or display of sexually oriented materials, obscene gestures, and similar sexually oriented behavior of an intimidating or demeaning nature."  *Id.*

[9] SUMF ¶¶ 69-72.  *See* Tab 7, Monaco Tr. 25:14-27:17 (noting "expansion" of efforts under Title IX following Department of Education's "Dear Colleague" letter); Tab 9, Reinoso Tr. 16:9-18:4 (describing changes in LSU's sexual harassment policies in response to "Dear Colleague" letter).

the "reported behavior violates PS-73 & PS-95." *Id.* ¶ 81.[10]  His conclusions were based on allegations of "the use of inappropriate language of sexual nature and use of profanity on a regular basis," and "[l]etters written by superintendents [that] also indicate a similar behavior, if not the same behavior, while working at various school districts." *Id.*[11]

The report did not separate the wheat from the chaff, in that it did not differentiate general allegations that Dr. Buchanan had been a "loose cannon" or "inappropriate" from specific claims that could constitute "harassment" under LSU's broad definitions.  Nor did it specify which of the allegations Reinoso thought were credible, and which failed to support his conclusions.  At his deposition, however, Reinoso clarified that most of the allegations in the report ***did not*** contribute to his finding that Buchanan had violated LSU's sexual harassment policies.[12]  Reinoso also said nothing in the Cancienne letter contributed to his finding of sexual harassment, despite its prominence in the case ultimately brought against Dr. Buchanan.[13]

Parsing through the report's bullet-pointed allegations, Reinoso's actual findings boiled down to just a few things: a remark attributed to Buchanan about the availability of birth control and condoms; the allegation that Buchanan once said a student's fiancée was "supportive now while the sex is good"; use of profanity in certain unspecified contexts; and the suggestion that

---

[10]  Reinoso also found a violation of the Americans With Disabilities Act based on a faculty member's report that Buchanan had discussed a student's accommodation based on a medical condition with the student's class.  *Id.*

[11]  Although the report makes reference to letters from school superintendents, Reinoso acknowledged that his investigation did not include any contact with the superintendents, that he had no knowledge of the substance or context of any such claims made, and that such letters ultimately played no part of his findings.  *Id.* ¶¶ 74, 89.

[12]  SUMF ¶ 86.  These discarded allegations included that Buchanan stated "You can't be in this program if you're pregnant," Tab 9, Reinoso Tr. 185:8-186:6, 206:14-17, 213:8-214:4, 224:16-25; commented that a woman is thought to be a dike if she wears brown pants, *id.* 221:15-222:15; videotaped a crying student, *id.* 69:18-24, 70:1-11, 200:4-8; was "harsh"; and asked a student take notes instead of speaking in class, *id.* 188:17-189:3, 199:6-13; and told a student, "You've not faced rejection yet, but it's coming."  *Id.* 186:7-187:1. It also eliminated some of her alleged profanity.  *Id.* 232:9-233:17.  *See also id.* 252:7-23.

[13]  SUMF ¶ 87.  Likewise, correspondence from other school districts, although described in the report, did not constitute evidence of sexual harassment.  *Id.* ¶ 89.

Buchanan referred to her own sex life during a time she went through a difficult divorce. SUMF ¶ 85. No suggestion was made that these purported instances were so severe, pervasive or objectively offensive that they could result in a denial of educational benefits. Rather, the report concluded only that Dr. Buchanan's behavior had been "inappropriate." *Id.* ¶ 81.

## 2. Decision to Seek Dismissal For Cause

Reinoso sent his findings to A.G. Monaco, who endorsed the report, SUMF ¶ 90, and Dean Andrew met with Reinoso and others to discuss it. *Id.* ¶ 97. Dr. Buchanan was not provided with Reinoso's report, but about six weeks after the meeting between Andrew and Reinoso, she received a shorter, condensed memorandum on the findings that did not detail the specific allegations made against her or identify any of the witnesses interviewed. *Id.* ¶ 98.

Andrew decided to pursue disciplinary proceedings against Buchanan pursuant to LSU's policy for Dismissal for Cause for Faculty, PS-104. *Id.* ¶ 99. He summoned Buchanan to meet with him on June 12, 2014, to discuss the summary report. *Id.* ¶ 101. At the meeting, he handed Buchanan a one-page sheet with a list of the policies she was accused of violating, without any discussion of the substance or source of the accusations, then called upon Dr. Buchanan to respond. *Id.* ¶ 102. In summarizing the exchange, Andrew later wrote that Buchanan "admitted to using profanity and language of a sexual nature, claiming it supported [her] overall pedagogical strategy when teaching at LSU," and that she stated "such language was often used to 'get the attention of students' and 'loosen them up.'" *Id.* ¶ 104.

Andrew rejected this explanation, finding it "unacceptable," and stating that he does not "condone any practices where sexual language and profanity are used when educating students, particularly those who are being educated to serve as PK-3 professionals." *Id.* His conclusions appeared to conflate the Cancienne allegations regarding use of the word "pussy" by making reference to being banned from a school district for "inappropriate behavior." *Id.* Yet he did not

address the pedagogical purpose behind that example, where Dr. Buchanan was providing instruction to student teachers on how to address the uses of everyday language of the parents in different communities.[14]   In any event, Andrew did not attempt to explain his categorical rule that any use of profanity was "unacceptable," since that is not the policy of LSU, Tab 1, Alexander Tr. 23:13-19 ("Q: Does LSU have a zero tolerance policy for profanity for its staff members?  A:  Not that I'm aware of.  Q:  Why not?  A: Just because we don't.  It's not a Title 9 violation.  It's not a civil rights violation."), or even the attitude of its HRM department.  Tab 7, Monaco Tr. 99:4 ("Q: Could a dean, for example, come in and adopt a zero tolerance policy on something like cursing? . . . A: Well, if that's the case, I'd be on death row."); Tab 9, Reinoso Tr. 109:5-15 (unwelcome profanity is not sexual harassment); SUMF ¶ 106.

Buchanan responded to Andrew July 1, 2014, noting her concern that she had to contend with "vague and indefinite charges," and that "[b]efore listening to the context or intention underlying my actions," Andrew and HRM had drawn unfair conclusions that denied her "due process" and resulted in the loss of her promotion.  SUMF ¶ 107.  Buchanan further "questioned the reliability and validity and findings from the HRM investigation, which centered on the complaints of a few disgruntled students and answers to leading questions of others, entirely discounting my explanation of the events."  *Id*.  Although Andrew said Buchanan's objections "Did not concern me," he acknowledged that had he learned the investigation was flawed in the ways she alleged, "[i]t could" have changed his conclusion regarding whether or not she had violated the sexual harassment policies.  *Id*. ¶ 108.

Following Buchanan's correspondence, Andrew sent a memorandum to Provost Bell, pursuant to PS-104, setting forth his "grounds for removal."  *Id*. ¶ 114.  Although PS-104

---

[14] SUMF ¶ 119.  Additionally, Andrew later acknowledged that he did not view Cancienne's decision to ban Buchanan as evidence of sexual harassment.  *Id*. ¶ 105.

requires "[d]ocumentation detailing any attempts made to correct the situation," Andrew only cited "the summarization of [Buchanan's] responses to the charges" that many of allegations made against her related to her pedagogy, which convinced him that remediation would be futile.[15]   Andrew viewed his memorandum to Provost Bell as his request that Buchanan be dismissed for cause for sexual harassment and ADA violations.  *Id.* ¶ 115.

### 3.  PS-104 Hearing

The PS-104 hearing to determine whether Dr. Buchanan should be terminated for allegedly violating PS-73, PS-95 and the ADA was conducted before a faculty committee in March 2015.  SUMF ¶ 128.  Committee members were not provided with materials or training on how to conduct the hearing, or explaining the sexual harassment standards in PS-73 and PS-95.  *Id.* ¶¶ 124-125.  Accordingly, the committee's chair said it was his understanding the sexual harassment standard was an "offensiveness" standard and that "sexual harassment is in the eye of the beholder."  *Id.* ¶ 126.

The University appointed a presenter to advocate for termination, but none of those who complained about Buchanan – neither Cancienne nor any of the students – testified at the hearing.  *Id.* ¶¶ 121, 129.  Instead, witnesses like Curry and Andrew presented second and third-hand information they had gathered.  *Id.* ¶ 130.  Dr. Buchanan did not receive a copy of the detailed HRM report that summarized the investigation interviews until just before the hearing.  *Id.* ¶ 123.

The faculty committee found the evidence insufficient to establish an ADA violation.  SUMF ¶ 132.  However, it found Dr. Buchanan had violated PS-73 and PS-95 based on an understanding that "unwelcome" or "inappropriate" language satisfied the test for harassment.

---

[15]   *Id.*   Contrary to this claim, Dr. Buchanan provided a detailed description, in writing, of how she used language for pedagogical purposes, backed by research.  *Id.* ¶ 119.   She explained that comments attributed to her had been taken out of context, but that if she had been informed that her approach had made students uncomfortable, "I would have corrected my behavior and language immediately."  *Id.*

*Id*.  Nevertheless, the committee did not recommend dismissal and instead proposed a censure and an agreement from Buchanan that she would modify her teaching methodology to reduce any use of "potentially offens[ive] language and jokes."   *Id*.   The committee criticized Buchanan's supervisors for failing to offer her "counseling before HRM engagement" or "re-training prior to implementing PS-104 proceedings."  *Id*. ¶ 133.  It also critiqued the "closed nature of the HRM investigation," which "did not offer Dr. Buchanan an opportunity to resolve charges once specifics of charges became known."  *Id*. ¶ 134.

### 4.    Alexander's Rejection of the Committee's Recommendation

Despite the committee's recommendation, Dean Andrew continued to press for dismissal. SUMF ¶¶ 137-138.  President Alexander acceded to these demands despite his obligation under PS-104 to "make the recommendation based on the recommendation of the committee of the faculty and the evidence presented in the hearing."  *Id*. ¶ 140.  In fact, Alexander never reviewed the hearing transcript, did not see any of the exhibits or evidence presented, nor did he even know which witnesses testified.   *Id*.   And, despite the fact that Reinoso confirmed that the complaint submitted by Cancienne had nothing to do with sexual harassment and played no part in the HRM report's findings, Alexander testified that his recommendation turned in large part on the Cancienne complaint.  *Id*. ¶ 142.  Evidently unaware that Reinoso's conclusions in the HRM report were confined to a few examples of "inappropriate" speech, Alexander mistakenly believed the case was about more than just profanity, poorly worded jokes, or occasionally sexually explicit jokes.  *Id*. ¶ 143.  He testified that if that was all that was at issue, the case "probably would not have progressed to this level."   *Id*.   Alexander rejected the faculty committee's recommendation that Buchanan not be dismissed, and instead urged the LSU Board of Supervisors to fire her.  *Id*. ¶¶ 144-145.

### 5.     Board of Supervisors Decision

The Board voted to terminate Buchanan based on Alexander's recommendation after a presentation of the issues by Monaco.  SUMF ¶¶ 148-155.  Although PS-104 requires the Chancellor to "provide the … Board of Supervisors with all documentation regarding the issue, including the report of the committee, of the faculty …, evidence presented at the hearing and written response by the faculty member," the Board was not presented with the hearing transcript or exhibits.  *Id*. ¶ 151.  Instead, Monaco assembled materials for the Board that included multiple copies of Cancienne's letter of complaint, correspondence from the complaining students, summary HRM memos (but not the full investigation memo), a few selected teaching evaluations, and some legal memoranda that called into question the constitutionality of LSU's sexual harassment policies.[16]  *Id*. ¶ 153.  In reaction to Buchanan's termination, the LSU Faculty Senate adopted a resolution to censure Alexander, Andrew, and Provost Bell, which recognized that "great universities have in place three significant measures to ensure the continued observance of academic freedom: Tenure; faculty governance; and due process," and that "all three measures have been violated in the case of Associate Professor Teresa Buchanan."  *Id*. ¶ 159.

## ARGUMENT

## I.     DR. BUCHANAN'S TERMINATION VIOLATED THE FIRST AMENDMENT

### A.     The First Amendment Protects Academic Freedom and Limits Anti-Harassment Policies

The speech for which Dr. Buchanan was fired falls squarely within the First Amendment's protections.  Academic freedom is a "transcendent value" and "a special concern

---

[16]  The information provided to the Board included an August 2009 memorandum from the Office of General Counsel of the University of California which concluded that the university's anti-harassment policy "is vulnerable to a challenge that it violates free speech rights" and advocating that it be modified to conform with Supreme Court precedents.  SUMF ¶ 154.  It also included a legal analysis by the Foundation for Individual Rights in Education that provided an overview of constitutional limits on anti-harassment policies and explaining the governing principles of *Davis*, 526 U.S. at 633.  *Id*.

of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). Accordingly, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). The Supreme Court has made clear that "[t]he classroom is peculiarly the 'marketplace of ideas,'" *Keyishian*, 385 U.S. at 603, and that the "essentiality of freedom in the community of American universities is almost self-evident." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

The Defendants' rote recitation of cases that relate generally to government employees says nothing about the rights at issue in the university setting. They cite *Garcetti v. Ceballos*, 547 U.S. 410 (2006), for the proposition that "*[i]n general*, the First Amendment does not protect speech made in an employment capacity," Def. Mot. 15 (emphasis added), but overlook the fact that the Court made clear it was ***not*** deciding a case that involved "academic scholarship or classroom instruction," nor altering established law protecting academic freedom. *Garcetti*, 547 U.S. at 425 ("We need not, and for that reason do not, decide whether the analysis we conduct today would apply" to "speech related to scholarship or teaching."). Accordingly, courts have declined to apply *Garcetti* "in the academic context of a public university." *Adams v. Trustees of Univ. of N.C.-Wilmington*, 640 F.3d 550, 561 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) ("*Garcetti* does not – indeed, consistent with the First Amendment, cannot – apply to … 'the academic duties' of a teacher and professor").

None of the cases Defendants cite contain the slightest suggestion that *Garcetti* extinguished established rights to academic freedom. *Williams v. Dallas Independent School District*, 480 F.3d 689 (5th Cir. 2007) (cited Def. Mot. 15), did not relate to speech at the university level or academic speech, but instead involved an athletic director's complaints about management

13

issues in a memo he claimed to have written "as a 'father' and 'taxpayer.'" *Id.* at 694. *Williams* was the first Fifth Circuit case that "began the task of embroidering *Garcetti's* general rule with new fact patterns," *Cutter v. Stephen F. Austin State Univ.*, 767 F.3d 462, 472 (5th Cir. 2014), and Defendants fail to mention that the other cases they cite **denied** defenses based on *Garcetti*.[17]

Accordingly, neither *Garcetti* nor the other cases Defendants cite disturbed established Fifth Circuit law that "classroom discussion is protected activity" under the First Amendment. *Kingsville Indep. Sch. Dist. v. Cooper*, 611 F.2d 1109, 1113 (5th Cir. 1980) (applying *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).[18] In *Cooper*, for example, the Fifth Circuit upheld a First Amendment claim after a high school history teacher was terminated for an in-class role-playing exercise that "evoked strong student feelings on racial issues" after being instructed that "nothing controversial should be discussed in the classroom." 611 F.2d at 1111. The court upheld the teacher's equitable claims for reinstatement and back pay, finding that "discharge for discussions conducted in the classroom cannot be upheld unless the discussions 'clearly … over-balance (her) usefulness as an instructor.'" *Id.* at 1113-14 (quoting *Kaprelian*, 509 F.2d at 139). Other courts have reached similar conclusions.[19] In light

---

[17] In *Cutter*, for example, the court held the former director of a state university's art galleries was terminated in retaliation for protected speech and that the defendants could not claim qualified immunity. *Id.* at 473. *Davis v. McKinney*, 518 F.3d 304, 316-17 (5th Cir. 2008) (Def. Mot. 15), denied a *Garcetti* defense for speech in which a state university employee was acting as a whistleblower, and says nothing about *Garcetti*'s application to academic speech.

[18] *See Kaprelian v. Texas Woman's Univ.*, 509 F.2d 133, 139 (5th Cir. 1975). *Cf. Reeves v. Claiborne Cty. Bd. of Educ.*, 828 F.2d 1096, 1099 (5th Cir. 1987) ("The initial inquiry under the *Mt. Healthy* test is whether the statements made or activities engaged in by the public employee are directed to matters of public concern *or are otherwise protected by the first amendment.*") (emphasis added).

[19] *See, e.g.*, *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679-80 (6th Cir. 2001) (First Amendment upholds classroom use of terms "nigger" and "bitch" in discussing how the terms are used to marginalize minorities); *Keefe v. Geanakos*, 418 F.2d 359, 360-61 (1st Cir. 1969) (enjoining termination of high school English instructor for assigning article that repeatedly used a "highly offensive … vulgar term for an incestuous son" as "a superlative of opprobrium," where the term had a valid pedagogical use). *Cf. Martin v. Parrish*, 805 F.2d 583, 586 (5th Cir. 1986) (speech is not protected where it constitutes "a deliberate superfluous attack on a 'captive audience' with no academic purpose or justification").

of these precedents, "the argument that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction, is totally unpersuasive." *Hardy*, 260 F.3d at 680.

Because Defendants fail to grasp the limits of *Garcetti*, they erroneously conclude that Dr. Buchanan's speech is unprotected by the First Amendment based on a false syllogism:  She engaged in speech "while teaching courses" that were "within the scope of her employment." Therefore, they reason, she was "not acting as a citizen or speaking on a matter of public concern," and her speech is unprotected.  Def. Mot. 17.  In making this argument, Defendants appear to admit the speech at issue was "part of her 'pedagogy,'" which, under applicable precedents, is why her speech ***is*** protected.  *E.g.*, *Keyishian*, 385 U.S. at 603; *Cooper*, 611 F.2d at 1114; *Kaprelian*, 509 F.2d at 139.  As the court explained in *Hardy*, 260 F.3d at 679, "[b]ecause the essence of a teacher's role is to prepare students for their place in society as responsible citizens, classroom instruction will often fall within the Supreme Court's broad conception of 'public concern.'"  This is precisely the nature of Dr. Buchanan's speech, and the reason she was terminated.[20]  Although Defendants maintain that her speech at times offended students (and others), "their sensibilities are not the full measure of what is proper education," or of what is protected by the First Amendment.  *Keefe*, 418 F.2d at 362.

Defendants claim they "reasonably believed" Dr. Buchanan's speech was unprotected by the First Amendment and that it was well-established that disciplinary action can be imposed for violations of harassment policies.  (Def. Mot. 9, citing *Harris v. City of Hammond*, 2008 WL

---

[20] Dr. Buchanan's criticisms of the administration of Iberville Parish schools, and her instruction to student teachers on how to communicate with parents clearly involved "protected conduct" and there can be no doubt it "was a motivating factor in her discharge." *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001). With those predicates established, the burden shifts to Defendants to prove they would have come to the same conclusion in the absence of the protected conduct. *Mt. Healthy*, 429 U.S. at 287. *See also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Cooper*, 611 F.2d at 1113; *Hardy*, 260 F.3d at 679.

4469112 (E.D. La. 2008)).   But *Hammond* says nothing about the tension between the First Amendment and anti-harassment policies, while the Fifth Circuit warned long ago that "when … sexual harassment claims [are] founded solely on verbal insults, pictorial or literary matter, the [regulation] imposes content-based, viewpoint-discriminatory restrictions on speech."  *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir. 1995).   Contrary to Defendants' blithe claims, what is "well-established" is that "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause," *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001), and various efforts to restrict campus speech under anti-harassment policies have been invalidated as a result.  *E.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008) ("[w]hen laws against harassment attempt to regulate … expression … we cannot turn a blind eye to the First Amendment implications") (quoting *Saxe*, 240 F.3d at 206, and *DeAngelis*, 51 F.3d at 596) (internal citations omitted).  *See also infra* § III.

The First Amendment thus does not permit university officials to equate offendedness with harassment.  *E.g.*, *Saxe*, 240 F.3d at 215 ("that someone might take offense at the content of speech is not sufficient justification for prohibiting it").  *Cf. DeAngelis*, 51 F.3d at 597 ("Title VII cannot remedy every tasteless joke or groundless rumor … in the workplace.").  When anti-discrimination or anti-harassment laws seek to regulate offensive words or symbols, the government is required to prove that the expression was "so severe, pervasive, and objectively offensive, and that [it] so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities."  *Davis*, 526 U.S. at 651; *Saxe*, 240 F.3d at 205-06.  *See also DeAngelis*, 51 F.3d at 596 (mere utterance of epithets that engender offensive feelings "were not severe or pervasive enough to create an objectively hostile or abusive work environment").

**B.     LSU's Sexual Harassment Policies Are Facially Invalid**

Any regulation of harassment to prevent a hostile educational environment must be drafted and applied with narrow specificity to avoid violating the First Amendment. *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996); *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 709 (9th Cir. 2010); *Bair v. Shippensburg Univ.*, 280 F.Supp.2d 357, 372 (M.D. Pa. 2003) (constitutional problems cannot be avoided by "[s]imply utilizing buzzwords applicable to anti-discrimination legislation").  This is because subjecting speech to a general prohibition of "harassment" means that "[e]very word spoken … on campus is subject to [regulation]," and "a lone individual who has a negative reaction" may subject the speaker to discipline. *McCauley v. Univ. of V.I.*, 618 F.3d 232, 251, 252 (3d Cir. 2010).  Dr. Buchanan's termination here violated the First Amendment because LSU's sexual harassment policies are unconstitutional on their face. *See, e.g.*, *UWM Post, Inc. v. Board of Regents*, 774 F.Supp. 1163, 1181 (E.D. Wis. 1991).[21]

Buchanan was fired for purportedly violating PS-73, which defines "sexual harassment" as "unwelcome verbal or physical conduct of a sexual nature or gender-based conduct … [that] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment," SUMF ¶¶ 62-63, and PS-95, which defines "sexual harassment" similarly as "unwelcome verbal, visual, or physical behavior of a sexual nature" or "unwelcome gender-based conduct." *Id.* ¶¶ 64-65.[22]  In tracking

---

[21]  As such, the Court must reject Defendants' threshold claim that Buchanan lacks standing to seek declaratory and injunctive relief against policies applied to terminate her.  Def. Mot. 18.  Even if Buchanan no longer teaches at LSU, and may not return, the collateral and future consequences of applying PS-73 and PS-95 to her, given the blemish on her record, afford her standing to challenge them. *E.g.*, *Esfeller v. O'Keefe*, 391 F. App'x 337, 340 (5th Cir. 2010).  Indeed, if successful, she will no longer be subject the disciplinary sanction, which would be removed. *Id. Cf. Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972).

[22]  These definitions of harassment (and examples in each policy) mirror those in a May 2013 letter that concluded a joint investigation of the University of Montana by the United States Department of Education's Office

17

the OCR/DOJ "blueprint," the policies violate the First Amendment – especially, though not solely, through their hostile environment harassment definitions – because they do not satisfy the basic constitutional requirements set forth in *Davis* and other cases.[23]   In fact, definitions in LSU's policies are effectively the same as those held facially unconstitutional in *DeJohn*.

As the Third Circuit has held, "unwelcome verbal … behavior of a sexual nature," without any requirement of objective offensiveness or interference with a reasonable person's access to his or her education, encompasses potentially any sex-related speech as long as someone deems it "unwelcome," even if that person is uniquely sensitive.  *Saxe*, 240 F.3d at 205. Under the First Amendment, a public institution may not broadly ban any sex-related speech based simply on its potential to offend.  *See, e.g.*, *Papish v. Board of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973); *DeJohn*, 537 F.3d at 318.  The requirement of an objective test for offensiveness has been a common element of numerous rulings on the constitutionality of university speech codes.[24]

Defendants do not defend the constitutionality of their sexual harassment policies used to terminate Dr. Buchanan, other than to underscore the extent to which they mirror the OCR/DOJ blueprint, and to urge that applying the policies, therefore, was not "unreasonable."  Def. Mot. 9-10.  However, various university speech codes and enforcement actions have been invalidated

---

of Civil Rights ("OCR") and Department of Justice ("DOJ"), which those agencies describe as providing a "blueprint for colleges and universities throughout the country."  *See* www.justice.gov/sites/default/files/opa/legacy/2013/05/09/um-ltr-findings.pdf.  *See also* Def. Mot. 9-10; SUMF ¶¶ 70-72.

[23]   The absence of these requirements makes PS-73 and PS-95 entirely different from the LSU Code of Conduct that survived constitutional challenge in *Esfeller*.  *See* 391 F. App'x at 340-42.

[24]   *E.g.*, *McCauley*, 618 F.3d at 251-52 (policy is unconstitutionally subjective because it "prohibits speech without any regard for whether the speech is objectively problematic"); *Saxe*, 240 F.3d at 205-06 (harassment must be severe, pervasive, and objectively offensive to satisfy First Amendment requirements).  *See also Esfeller*, 391 F. App'x at 341.  The Fifth Circuit distinguished *Saxe* in *Esfeller* because LSU's policy there avoided restricting speech "that is merely offensive to someone," because it did not prohibit merely "hostile, disruptive, or offensive speech," and "require[d] that the expression be persistent, extreme or outrageous."  *Id*.  Under the current policy set forth in PS-73 and PS-95, this is no longer true.

despite the schools' invocation of their obligation to enforce such rules under civil rights statutes.[25]   Of specific relevance here, the 2013 OCR/DOJ "blueprint," upon which LSU's current policy is based, lacks the necessary safeguards.[26]   No "interpretive guidance" from the federal government can alter these constitutional minimums, *Miller v. Johnson*, 515 U.S. 900, 923 (1995), and federal agency interpretations cannot immunize Defendants against constitutional claims – such pronouncements are controlling ***only*** if they do not violate the Constitution.[27] As the Supreme Court has stressed, courts cannot "accept the contention that the State has a compelling interest in complying with whatever [] mandates [DOJ] issues." *Id*. at 922.  *See United States v. St. Junius*, 739 F.3d 193, 213 n.22 (5th Cir. 2013).  Nor are the policies saved by their promises that they are "not intended to infringe upon constitutionally guaranteed rights nor upon academic freedom." Tab 14, Pl. Dep. Ex. 4, PS-73 at 1; Tab 15, Pl. Dep. Ex. 5, PS-95 at 1. Such pledges of restraint cannot immunize infringements on First Amendment rights.[28]

---

[25] *E.g.*, *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 388-89, 393 (4th Cir. 1993); *Saxe*, 240 F.3d at 205-06; *Rodriguez*, 605 F.3d at 709 ("First Amendment principles must guide [] interpretation of the right to be free of purposeful [] harassment" in colleges.).

[26] It is worth noting that six Fifth Circuit judges joined an opinion observing the 2013 blueprint tracks the similar speech code that *DeJohn* invalidated, and "will dramatically curtail free speech on campus in the name of alleviating sex discrimination."  *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 476 n.3 (5th Cir. 2013) (Jones, J., dissenting) (citing *DeJohn*, 537 F.3d at 313-20).

[27] OCR previously advised that alleged harassment "must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive," OCR, *First Amendment: Dear Colleague*, July 28, 2003 (http://www2.ed.gov/print/about/offices/list/ocr/_firstamend.html), but this solicitude for the First Amendment changed in 2010, when OCR abandoned the *Davis* standard, took the position that harassment "does not have to be directed at a specific target, or involve repeated incidents," and dropped references to the requirement previously stressed that alleged conduct must be objectively offensive.  OCR, Dear Colleague Letter, Oct. 26, 2010 (*available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf).

[28] *E.g.*, *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1182-83 (6th Cir. 1995); *United States v. Stevens*, 559 U.S. 460, 480 (2010) (basic First Amendment principles do not leave the speaker "at the mercy of *noblesse oblige*"); *College Republicans at San. Fran. St. Univ. v. Reed*, 523 F.Supp.2d 1005, 1020 (N.D. Cal. 2007) (enjoining conduct code despite language that "prohibits disciplinary action … based on behavior protected by the First Amendment").

### C.    LSU's Sexual Harassment Policies Were Applied Unconstitutionally

Not only was Dr. Buchanan subjected to facially invalid speech restrictions, the process by which they applied the rules was broken.  How broken?  In the end, as with the child's game of telephone, not even her accusers knew why they had fired her.

To begin with, Reinoso's HRM report did not examine events in context.  A prime example is Cancienne's complaint, which jump-started Defendants' concerns.  This complaint became a center-piece of the "sexual harassment" findings, even though that thought never occurred to Cancienne, who was more upset that he and his schools had been criticized.  SUMF ¶¶ 35, 37-39.  In fact, Cancienne never interpreted Dr. Buchanan's words as sexual.  *Id*. ¶ 39.  Nonetheless, his complaint was the source of allegations that Buchanan used the word "pussy," *id*. ¶ 88, which even somehow "telephoned" its way into complaints of a student who was not present for the utterances, Tab 42, Pl. Dep. Ex. 107 at 2, then was repeated across the sexual harassment findings and recommendations, even though it was later admitted the term had no sexual connotation at all.  SUMF ¶¶ 38-40.  Reinoso could have learned these things had he talked to Cancienne, but he never did, relying instead on what others passed along and his own assumptions.[29]

Further, although it cannot be gleaned from the text of his report, most of the statements Reinoso described in it did not contribute to his ultimate "finding," because many of the witness claims could not be corroborated, while others did not inform his conclusions at all, because they had nothing to do with sexual harassment.  SUMF ¶ 91.  He admitted, for example, that,

---

[29]  SUMF ¶¶ 41-42.  Reinoso similarly did not speak to Jennifer Marangos of the Zachary Parish schools, and ultimately admitted that everything in her letter that made its way into his findings (and everything else in it) did not constitute sexual harassment.  *Id*. ¶¶ 74, 89.  That did not stop others up the chain from citing it in invoking PS-104 and seeking Dr. Buchanan's termination.  Tab 39, Pl. Dep. Ex. 100 at DEFENDANTS-00119 (July 14, 2014 Memorandum from Andrew to Bell); Tab 18, Pl. Dep. Ex. 16 at OETTING-00259 (Mar. 26, 2015 Oetting appeal); Tab 51, Pl. Dep. Ex. 151 at DEFENDANTS-00816, 834, 857 (June 15, 2015 email to Board of Supervisors)**.**

although the use of expletives and colloquialisms was emphasized by some witness and noted in the report, they did not constitute sexual harassment. *Id*. ¶ 92. The same was true of various statements cast in terms of sexuality that were breathlessly recited in the report's recount of witness statements.[30] As a consequence, most of what the report deemed "inappropriate" played no role in the sexual harassment finding.[31] Ultimately, that finding rested on a handful of scattered, isolated utterances. *See supra* 7-8 & nn.12-13. Of course, neither Reinoso nor his report said so, causing others to rely on discounted and discredited "findings" in a process that snowballed toward Buchanan's dismissal.

Dean Andrew, for example, expressly relied on parts of Reinoso's report that have now been disavowed when he rejected Buchanan's defense of her pedagogy[32] and in setting the PS-104 hearing.[33] His memo to the Provost, despite ostensibly seeking a PS-104 hearing based on sexual harassment, is littered with statements from student reviews and other "stakeholders" that have nothing to do with sexual harassment. SUMF ¶ 100; Tab 39. Similarly, his claim that

---

[30] SUMF ¶ 93 (Tab 9, Reinoso Tr. 221:15-222:15 (comment that a woman is thought to be a dike if she wears brown pants was not relied upon as grounds for sexual harassment); 144:2-19 (discussing allegations of "references and jokes about her personal life, including to sex")).

[31] SUMF ¶ 94. Tab 9, Reinoso Tr. 146:14-147:24, 148:4-150:19 (as Reinoso did not speak to him, Cancienne letter alleging inappropriate statements did not factor into findings), 196:5-197:4 (Reinoso could not corroborate Ginn's claim that Buchanan "told us to stay away from boys unless the sex is good" and it thus did "not necessarily" contribute to sexual harassment finding); 197:5-11 (calling a student lazy and attributing it to her weight was not corroborated and did not contribute to finding of sexual harassment), 206:14-17, 213:8-214:4, 224:16-25 (statement that if you want to be a wifey or a mommy, this is not the profession for you did not constitute sexual harassment), 214:6-10 (Buchanan openly discussing her divorce in class did not contribute to finding of sexual harassment), 69:18-24, 70:1-11, 200:4-8 (taping crying student to show how ridiculous she looked had nothing to do with sexual harassment), 186:7-187:1 (uncorroborated quote that "You might not have faced rejection yet, but it's coming" did not factor into sexual harassment finding), 189:4-190:2 (comment from elementary-school teacher to complaining student that "I've heard all about you from Dr. Buchanan" could not be determined to be positive or negative so did not factor into sexual harassment finding), 198:17-21 (being yelled at, told "listen to me," and dismissing coat drive had nothing to do with sexual harassment), 199:145-18, 199:19-22, 199:24-200:3, 200:9-201:19, 204:25-205:25 (harsh statements, criticism, and similar recited complaints did not constitute sexual harassment).

[32] SUMF ¶ 100. *E.g.*, Tab 37, Pl. Dep. Ex. 97 at DEFENDANTS-00115 (announcing intent to pursue PS-104 dismissal based in part on "profanity" and "inappropriate behavior" in, *e.g.*, Superintendent Cancienne's district). *Cf.* Tab 7, Monaco Tr. 137:15-25 (Andrew and Provost do not have particular expertise in sexual harassment).

[33] SUMF ¶ 100. Tab 39 (citing, *inter alia*, "brown pants" and "mommies and wives" comments, Cancienne concerns, and other matters that Reinoso disavowed as not contributing to HRM's sexual harassment finding).

21

"Buchanan admitted to the behavior that led to the [HRM] conclusions," *id.*, makes no distinction between the majority of allegations that Reinoso agreed did ***not*** involve sexual harassment, and those that concerned him. *Id.* Of course, Buchanan, having no way of knowing which was which, could not have possibly "admitted" any PS-73 or PS-95 violations. Dean Andrew's memo, if anything, is a confession not only of intent to fire a tenured professor based on pedagogy and performance, but that the only way he could think to do so was through LSU's defective sexual harassment policies.

The faculty committee hearing only magnified these problems. *Contra* Def. Mot. 17. Not only was the committee charged with applying constitutionally infirm policies (PS-73 and PS-95), it was not provided any materials or training elucidating the operative standards. SUMF ¶ 124-125. The hearing testimony against Buchanan simply restated the second-hand accounts reported to Reinoso, even though he had, as LSU's avowed sexual harassment "expert," discounted much of their statements as being unrelated to sexual harassment. *Id.* ¶ 131. *See supra* 7-8 & nn.12 & 13, 20-21. Not surprisingly, under these conditions, the committee found a sexual harassment violation, yet no one could name specifically what the violation entailed. Nevertheless, the committee did not recommend termination.

Despite that recommendation, Defendants continued to pursue termination based on irrelevant evidence. Among the few key points cited in the presenter's appeal of the committee's finding to President Alexander was the Cancienne complaint, which never had anything to do with sexual harassment. SUMF ¶¶ 135-136. Alexander rejected the committee recommendation (and effectively granted the appeal) despite having not read the PS-104 hearing transcript, not knowing the definition of sexual harassment the committee used, not understanding the con-stitutional standard, and generally not knowing what actually happened. *Id.* ¶ 144.

Ultimately, the sexual harassment finding against Dr. Buchanan rested on a handful of stray statements amid a collected volume of speech that even Defendants and their witnesses/sources admit did not constitute harassment.  And there is absolutely nothing to indicate that anyone, at any stage of the process, determined these few statements were severe or pervasive, or objectively offensive, as the constitutional authority requires.  That net result is *exactly* what happens if policies governing "harassing" speech are not sufficiently defined or limited, and it is why Buchanan's termination was unconstitutional.

## II.     BUCHANAN'S TERMINATION VIOLATED DUE PROCESS

Defendants also violated Dr. Buchanan's Fourteenth Amendment right to due process.  The bare recital of steps LSU took – in a lone paragraph citing neither evidence nor legal authority, Def. Mot. 17 – cannot demonstrate that Dr. Buchanan received the notice and opportunity to be heard to which she is entitled as a tenured professor.  *Jones v. La. Bd. of Supervisors of Univ. of La. Sys.*, 809 F.3d 231, 236 (5th Cir. 2015); *see Levitt v. Univ. of Texas at El Paso*, 759 F.2d 1224, 1227-28 (5th Cir. 1985) (enumerating protections).  *See also Roth*, 408 U.S. at 576.  *Cf. Clements v. Airport Auth. of Washoe Cty.*, 69 F.3d 321, 332 (9th Cir. 1995) ("invok[ing] magical phrases 'notice' and 'opportunity to respond'" cannot salvage a "process [that] appears to fall far short of that required") (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)).  That is especially true where the charges were never clear, at any stage of the process, because of how Reinoso compiled his sexual harassment finding, and how decision-makers up the chain relied on it.  *See supra* 7-11, 20-21.

When Reinoso met with Dr. Buchanan, she was questioned but not provided specifics of allegations against her, or told who had made them.[34]  The "HRM-EEO findings" later presented to her consisted solely of conclusions and "examples" of "allegations" that were merely a summary of the full findings.  This opacity of specific acts of wrongdoing alleged against Buchanan limited her ability to defend herself as Dean Andrew and Provost Bell took steps to convene PS-104 proceedings.  *See* SUMF ¶¶ 107, 119.

As to the full "Findings," there was no analysis ***explaining*** how Dr. Buchanan violated LSU's sexual harassment policies.  There was only recap of each interview, Tab 16, Pl. Dep. Ex. 7 at OETTING-00042-52, a brief "Summary," *id*. at OETTING-00052-53, and bottom-line findings in conclusory fashion.  *Id*. at OETTING-00054.  Beyond the one-sided nature of how Reinoso proceeded by not interviewing Cancienne (or Marangos) or Dr. Buchanan's non-complaining students, *see supra* 20 & n.29, by asking leading questions and perhaps browbeating witnesses, SUMF ¶ 76, and/or by mischaracterizing testimony, *id*., this failure to connect the evidence and conclusions is fatal to any notion of due process.  Few things in the report contributed to the sexual harassment finding, but no one involved in the process had any way to know that.  *See supra* 7-8 & nn.12-13, 20-21 & nn.30-31.  SUMF ¶ 95.

Everything in the report was thus treated by all who received it as a "finding" of sexual harassment, and relied upon as such.  Dean Andrew recited liberally from all parts of the report in seeking PS-104 proceedings, Tab 39, Pl. Dep. Ex. 100 at DEFENDANTS-00119-20, the faculty committee based its decision on it, Tab 13, Pl. Dep. Ex. 3 at OETTING-00248, and President Alexander admittedly relied on the report rather than the committee recommendation.

---

[34]  SUMF ¶ 78.  A month later, these "particulars" still had not been provided, forcing Buchanan to request them, but all she received were copies of student evaluations – not complaints relevant to any claim of sexual harassment – and copies of the superintendent letters that had nothing to do with sexual harassment.  *Id*. ¶ 79.

SUMF ¶¶ 144-145.  And Defendants admit these flawed materials "formed the basis of the recommendation to the Board."  Def. Mot. 17.

None of this was communicated to Buchanan.  So even once she received the full report, she could only guess as to which allegations touched on sexual harassment, and which already had been disregarded as ephemera, depriving her of any opportunity to address those distinctions at *any stage* before *any* LSU decision-maker.  Under due process, a "tenured public employee is entitled to … an explanation of the employer's evidence and an opportunity to present his side of the story."  *Loudermill*, 470 U.S. at 546.  Here, the fact that that "explanation" came only once Reinoso was deposed, many months after Dr. Buchanan's termination, negated her ability to present "her side" on the *specific* charges.[35]

Defendants suggest this is all immaterial because Buchanan received a hearing before the faculty committee and the Board made the ultimate termination decision, and she was "permitted to appeal … during the process."  Def. Mot. 17.  But those steps cannot cure a due process violation.  "Generally, an adjudication … tainted by bias can not be constitutionally redeemed by review in an unbiased tribunal."  *Clements*, 69 F.3d at 333.  Such bias existed here in Reinoso's failure to particularize what conduct of Buchanan's actually constituted sexual harassment (as did his one-sided approach), and affected all subsequent levels of the decision-making.[36]  These "inherent deficiencies" are critical, as "mere opportunity unsuccessfully to bring due process violations to … a discretionary appellate-type forum," like the faculty committee or Board here,

---

[35]  The "constitutional minima" require "access to the material upon which the charge was based," *Loudermill*, 470 U.S. at 542, not just access to that material intermingled with an accretion of other, undifferentiated accusations that did not make up the charge.

[36]  The denial to Buchanan of the details of Reinoso's investigation regarding specifics of what she was alleged to have done, and by whom, indicates absence of minimum due process.  *McCoy v. Michigan*, 2007 WL 1098261, at *5 (E.D. Mich. Apr. 10, 2007), *aff'd in part, rev'd in part on other grounds*, 369 F. App'x 646 (6th Cir. 2010).

"does not constitute the notice and opportunity to be heard that is guaranteed by the Due Process clause." *Dalley v. Vought Aircraft Co.*, 141 F.3d 224, 231 (5th Cir. 1998).[37]

## III.   DEFENDANTS CANNOT CLAIM IMMUNITY

Defendants cannot gain judgment or dismissal based on sovereign immunity, as they are all sued in both their individual and official capacities, so no Eleventh Amendment immunity applies to Plaintiff's requests for damages on her as-applied challenges. *See, e.g.*, *New Orleans Towing Ass'n v. Foster*, 248 F.3d 1143 (5th Cir. 2001) ("[I]t is well established in this circuit that a suit against a state officer in his or her individual capacity for money damages is not a suit against the state for purposes of Eleventh Amendment immunity."). Moreover, Count III of the Complaint, asserting facial challenges, are addressed to Defendants in their official capacities and are limited to requests for prospective, injunctive relief. Accordingly, sovereign immunity has no application in these respects. *Ex parte Young*, 209 U.S. 123 (1908).

Qualified immunity also must be denied where facts set forth by Plaintiff make out a violation of a constitutional right that was clearly established at the time of Defendants' misdeeds. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Cutler*, 767 F.3d at 469; *Hardesty v. Cochran*, 621 F. App'x 771, 780 (5th Cir. 2015). In this case, the record makes clear Defendants sought Buchanan's dismissal based on her academic speech, which violates well established First

---

[37]   At minimum, there is "a factual question whether ... investigations" were "sufficiently independent as to cure any due-process deficiency in the earlier inquir[y]," especially where, as here, "there is no evidence in the record [any subsequent decision-maker] was made aware" of the deficiency. *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010). *See also id*. at 718 ("'fundamentally biased process is not *due* process'") (citation omitted). In such a case, the court "must grapple with the possibility that the potentially biased nature of the school's investigation corrupted the integrity of subsequent investigations," *id*. at 719, and summary resolution is unwarranted. That is also true given the extent to which students who complained—whose complaints, as it turned out, ultimately formed the sole basis for HRM's sexual harassment finding—were never presented for examination by Buchanan. Even for proceedings that are not "elaborate," if there are factual disputes, the accused may be entitled to "a fair opportunity ... to confront an accuser in front of the decisionmaker." *Loudermill*, 470 U.S. at 553.

Amendment principles.[38]  Fifth Circuit precedent did far more than give Defendants "fair warn-ing" that Plaintiff's rights were clearly established.  *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).  *See Cooper*, 611 F.2d at 1113-14.

No competent college administrator could be ignorant of these basic principles, but the Defendants here have even less of an excuse, because the materials they furnished to the Board – ostensibly to support Alexander's recommendation to terminate Buchanan – ***explained precisely why the LSU policies they employed violate the First Amendment***.  Thus, a memo by the University of California General Counsel's office explained that "[w]here public university anti-harassment policies have been challenged, courts virtually uniformly struck them down."  SUMF ¶ 154; Tab 51, Pl. Dep. Ex. 151 at DEFENDANTS-00897.  Specifically, it explained how harassment policies that track the ones in *DeJohn* – like those here – are constitutionally suspect.  *Id*. at DEFENDANTS-00897-98.  *See also supra* § I.B.  The packet also included a memorandum by the Foundation for Individual Rights in Education, Tab 51, Pl. Dep. Ex. 151 at DEFENDANTS-00901-08, explaining that speech sanctionable as harassment cannot simply be based on language "some person finds offensive," *id*. at DEFENDANTS-00902, but rather must be objectively offensive, *id*., *passim*, and must also be severe and pervasive as well.  *Id*. at DEFENDANTS-00901-02, 904-06, 908.  As noted above, these requirements are missing from PS-73 and PS-95.  Yet despite being put on notice of the types of constitutional infirmities that were apparent from the faces of the policies they purported to apply, Defendants still advocated

---

[38]   Given the fact that "teaching and academic writing are at the core of the official duties of teachers and professors," and that such expression is a "'special concern of the First Amendment,'" *Demers*, 746 F.3d at 411 (quoting *Keyishian*, 385 U.S. at 603), it is fair to say *Garcetti* and cases applying it "did not alter First Amendment jurisprudence in any way that would render the currently applicable law not clearly established." *Hardesty*, 621 F. App'x at 780-81.  *See Kerr v. Hurd*, 694 F.Supp.2d 817, 843 (S.D. Ohio 2010) (absent guidance from Supreme Court or circuit, court "will continue to apply the traditional *Pickering-Connick* approach to cases involving in-class speech").

termination to the Board, and the Board acted accordingly.  There is no basis here for qualified immunity.[39]

Defendants' liability is not cut-off simply because the Board of Supervisors accepted their recommendations and finalized Buchanan's dismissal.  Def. Mot. 10.  Their reliance on *Beattie v. Madison County School District*, 254 F.3d 595 (5th Cir. 2001), for the proposition that they may avoid liability because the Board took the final action, is misplaced.  "[A]ll that is necessary" is that Dr. Buchanan show the Defendants "effected the termination" handed down by the Board, to establish a First Amendment claim.  *Powers v. Northside Indep. Sch. Dist.*, 143 F.Supp.3d 545, 550 (W.D. Tex. 2015).  So long as Dr. Buchanan can show Defendants' actions were in violation of the First Amendment, and that grounds they offered the Board for termination were the one they accepted, individual liability for Defendants attaches.  *Id*.  Here, the record is undisputed that the Board exercised no independent judgment regarding the basis for dismissing Buchanan, and acted based on Defendants' selected evidence and recommen-dations.  *See supra* 12.  *See also Culbertson v. Lykos*, 790 F.3d 608, 626 (5th Cir. 2015) ("We did not necessarily hold that there was no individual liability simply because the board made the decision."); *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 758 (5th Cir. 1986) (requiring only that plaintiff show "an affirmative causal link" between a principal's recommendation to reassign an athletic director and the school district decision to do so).

---

[39] Citing the discretionary nature of each Defendant's position and actions does not bolster the case for immunity.  Def. Mot. 11-15.  Governmental actors performing such discretionary functions enjoy qualified immunity only "***insofar as*** their conduct does not violate clearly established … rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added).  *Accord* Def. Mot. 9 (quoting *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007) (citing, *inter alia*, *McClendon v. City of Columbia*, 305 F.3d 314, 322-23 (5th Cir. 2002) (quoting *Harlow*)).

## IV.   MISCELLANEOUS DEFENSES

### A.   The Court Can Provide Effective Relief

Defendants contend they lack the authority "in their official and personal capacities to overturn the decision of the Board of Supervisors or to reinstate Plaintiff," Def. Mot. 17, but they seem to have forgotten who effectuates hiring decisions at the university.   University policy PS-36 dictates the tenured faculty hiring process, and vests authority to select faculty for appointment with the LSU Department making the hire, Tab 62, PS-36 at 17-18, and specifically calls for the Dean, HRM, and the University President's involvement in the process.   *Id.*   Thus, in their respective official capacities, Defendants Andrew, Monaco, and Alexander have the requisite authority to reinstate Buchanan to her position at LSU should this Court grant Plaintiff's requests for declaratory and injunctive relief.   *See Cooper*, 611 F.2d at 1113-14 (upholding equitable claims for reinstatement and backpay to remedy wrongful termination).

### B.   Plaintiff's Claims Are Not Time-Barred

Finally, Defendants argue that claims against Andrew, Monaco, and Reinoso are time-barred because many of their actions to further Buchanan's dismissal occurred more than one year before Plaintiff filed suit.   Def. Mot. 18.   Defendants' reliance on *Van Heerden v. Board of Supervisors of Louisiana State Univ.*, 2011 WL 5008410 (M.D. La. Oct. 20, 2011), is inapposite however, because that decision held a plaintiff "cannot combine ***separate, discrete instances of First Amendment retaliation*** into a continuing violation for purposes of his § 1983 claim."   *Id.* at *8 (emphasis added)   Here, Defendants' various actions are part of a single course of conduct that applied an unconstitutional sexual harassment standard and culminated in Dr. Buchanan's termination.   In this case, the "adverse employment action" complained of is Buchanan's firing, on June 19, 2015, and she filed suit seven months later.   Defendants' contention that their

29

various actions in furtherance of obtaining Buchanan's dismissal are distinct "adverse employment actions" occurring over a year before suit to avoid liability is absurd.

## CONCLUSION

For the foregoing reasons, Plaintiff Dr. Teresa Buchanan respectfully requests that the Court grant her Motion for Summary Judgment, and deny the Defendants' Motion for Summary Judgment, and their previously filed Motion for Judgment on the Pleadings that is effectively identical thereto.

DATED: April 7, 2017

Respectfully submitted,

/s/ Robert Corn-Revere
ROBERT CORN-REVERE (*pro hac vice*)
      bobcornrevere@dwt.com
RONALD G. LONDON (*pro hac vice*)
      ronnielondon@dwt.com
LISA B. ZYCHERMAN (*pro hac vice*)
      lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
Telephone: (202) 973-4200

/s/ Floyd J. Falcon, Jr.
FLOYD J. FALCON, JR. (Bar # 5424)
AVANT & FALCON
429 Government Street
Baton Rouge, Louisiana 70802
Telephone: (225) 387-4462

Attorneys for Plaintiff Teresa Buchanan

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Consoli-

dated Memorandum in Support of Plaintiff's Motion for Summary Judgment and Opposition to

Defendants' Motions for Summary Judgment and Judgment on the Pleadings was served upon

all counsel of record on the 7th day of April, 2017 via use of the Court's ECF system.


_____ */s/ Robert Corn-Revere*_____
                    Robert Corn-Revere