# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

TERESA BUCHANAN                                                   CIVIL ACTION

VERSUS                                                                16-41-SDD-EWD

F. KING ALEXANDER, DAMON ANDREW,
A.G. MONACO, AND GASTON REINOSO

## RULING

This matter is before the Court on the cross *Motions for Summary Judgment*[1] by Defendants, F. King Alexander, Damon Andrew, A.G. Monaco, and Gaston Reinoso ("Defendants") and Plaintiff, Teresa Buchanan ("Plaintiff"). The parties have filed *Oppositions*[2] and *Replies*[3] to the cross-motions. On September 25, 2017, the Court held Oral Argument on limited issues raised in the Parties' motions, and the Court allowed the Parties to submit post-hearing memoranda.[4] The Court has considered all of the evidence presented, the arguments of counsel, and the law as applied to the undisputed facts of this case. For the following reasons, the Court finds that summary judgment should be granted in favor of the Defendants.

---

[1] Rec. Doc. Nos. 30 & 35. Defendants also moved for judgment on the pleadings (Rec. Doc. No. 26) which appears to have been improperly terminated by Rec. Doc. No. 32. However, because these issues are covered by the parties' cross-motions for summary judgment, the Court will address those matters herein.
[2] Rec. Doc. Nos. 42 & 43.
[3] Rec. Doc. Nos. 46 & 47.
[4] Rec. Doc. Nos. 60 & 61.
40573

## I.    FACTUAL BACKGROUND

This lawsuit arises out of the termination of Plaintiff's position of tenured professor by the Board of Supervisors ("the Board")[5] of Louisiana State University and Agricultural and Mechanical College ("LSU").[6]  The Defendants are:  F. King Alexander ("Alexander"), President and Chancellor of LSU; Damon Andrew ("Dean Andrew"), Dean of the College of Human Sciences and Education at LSU; A.G. Monaco ("Monaco"), the Vice Chancellor of the Office of Human Resource Management at LSU; and Gaston Reinoso ("Reinoso"), the Director of the Office of Human Resource Management and Executive Director of Equal Employment Opportunities at LSU.

Plaintiff joined the faculty of LSU in 1995 and was promoted to Associate Professor with tenure in 2001.[7]  Plaintiff created LSU's "Early Childhood Program," a teacher education program for pre-school through third-grade instruction known as the "PK-3" program.[8]  Plaintiff is widely published in top academic journals and claims she had demonstrated significant success in securing funding for both her research and early childhood initiatives at LSU.[9]  Prior to the inception of the underlying conduct at issue, Plaintiff was recommended for a promotion to Full Professor following a review process that included the approvals of a Tenure and Promotion Committee, the Director of the School of Education, and the Dean of the College of Human Sciences and Education, Defendant Andrew.[10]  However, Dean Andrew later rescinded this recommendation.[11]

---

[5] The Board is a constitutionally created entity required "to supervise and manage the institutions … administered through its system," La. Const. Art. 8 § 7, including LSU.  La. R.S. 17:3215(1).
[6] Rec. Doc. No. 36-1, ¶ 155.
[7] Rec. Doc. No. 36-1, ¶¶ 1-3.
[8] *Id.* ¶¶ 10-12.
[9] *Id.* ¶¶ 4-9.
[10] *Id.* ¶¶ 13-15.
[11] *See* Rec. Doc. No. 14, ¶ 18.
40573

In mid-November 2013, Ed Cancienne ("Cancienne"), Superintendent of the Iberville Parish Schools District, complained about Plaintiff's "professionalism and her behavior" during her visits to schools in his district while she was overseeing the PK-3 program.[12] Cancienne was reportedly very upset because he heard that Plaintiff had been condescending to the teachers during her site visits with LSU student teachers and their mentor teachers.[13] Plaintiff claims that, in response to this complaint, she attempted to "smooth Cancienne's ruffled feathers"[14] by an email on that same day wherein she apologized for any offense and affirmed that his Parish was "full of excellent teachers and very bright students."[15] Despite this apology, Plaintiff contends Cancienne called her personal cell phone and demanded that she come to his office and discuss the matter "just the two of us."[16] Plaintiff admits she had no desire to meet with Cancienne alone as she had previously reported to Associate Dean Jennifer Curry ("Curry") that Cancienne had flirted with her and she thought him "creepy."[17] Plaintiff maintains that Curry and another female LSU faculty member shared this view of Cancienne.[18]

After Cancienne and Plaintiff spoke on the phone about this incident, Cancienne called Curry to complain that he had been advised that, while Plaintiff was at an Iberville school to assess a PK-3 program student teacher, Plaintiff referred to Cancienne as "crazy", "talked awful about our schools," and used the word "pussy three times."[19] In fact, Plaintiff claims Cancienne advised Curry that if Plaintiff returned to Iberville schools,

---

[12] Rec. Doc. No. 36-1, ¶¶ 16-18.
[13] *Id.* ¶¶ 18-21.
[14] Rec. Doc. No. 35-1, p. 2.
[15] Rec. Doc. No. 36-1, ¶ 24.
[16] *Id.* ¶ 25.
[17] *Id.* ¶ 22.
[18] *Id.* ¶ 22-23.
[19] *Id.* ¶ 28.

40573

he would "have her arrested."[20]  While Cancienne clearly objected to Plaintiff's use of the term "pussy," he claimed that he did not believe it was used in a sexual context or to engage in sexual harassment, but was used as part of Plaintiff's instruction to student teachers regarding coping with parents who may use different vocabularies.[21]  Plaintiff claims that LSU investigators never inquired into the nature of Cancienne's complaints and only assumed, without supporting evidence, that Plaintiff's use of the word "pussy" was slang for female genitalia.[22]  Further, Plaintiff contends that no one at LSU inquired into the actual nature of Cancienne's concerns, which she claims were primarily based on Plaintiff's criticism of his school and teachers and not related to any kind of sexual harassment.[23]

Student complaints also formed the basis of the investigation into Plaintiff's conduct.  Curry testified that two of Plaintiff's students requested a meeting to discuss their complaints about Plaintiff's classroom behavior.  Student 1 claimed she was offended by Plaintiff's comments about Student 1's sexual relationship with her fiancé. Student 1 stated that she was humiliated by Plaintiff's references to her sexual relationship in front of her classmates.  According to Student 1:

> Dr. Buchanan had offered them condoms, had told them it was unacceptable to become pregnant.  And that if you chose to become a mother, that your grades would suffer for that.  She told them … enjoy the sex while the sex is – good.  If you're dating – if you're dating, make sure the sex is good, something along those lines.[24]

Student 1 was also particularly offended when, after having advised Plaintiff that her

---

[20] *Id.* ¶ 29.
[21] *Id.* ¶¶ 39-40.
[22] *Id.* ¶¶ 37; 42-43.
[23] *Id.* ¶ 42.
[24] Rec. Doc. No. 65-4, p. 2; Deposition of Jennifer Curry, p. 69, lines 3-10.
40573

fiancé was very supportive, Plaintiff allegedly responded, "yeah, he's supportive now while the sex is good, but just wait until you're married five years."[25] Curry testified that Student 1 stated: "I don't know who she is to make these assumptions about me, and to say it in front of a room full of people."[26]

Student 1 also reported to Curry that Plaintiff had recorded a student (Student 2) crying during an assessment team meeting and played the recording back for the student.[27] Student 2 met with Curry and complained that Plaintiff had intimidated and demeaned her by video recording this incident during a team assessment meeting. Regarding this incident, Dr. Curry testified:

> … during her assessment team meeting, [the student] began to cry. She said that Dr. Buchanan was yelling at her. And that when she started to cry, Dr. Buchanan got out her cell phone and did not ask her, but started to record her crying and then played it back for her, she said, look at yourself, look at yourself, you need to check yourself in somewhere and get help, get a break.[28]

Curry further testified that Student 2 reported that this meeting was "mortifying,"[29] and that:

> Terry [Plaintiff] was extremely aggressive during this assessment team meeting. She said every time she tried to talk, Terry would say, shut up, you're not listening, be quiet, be quiet, like screaming at her, very aggressive. She said it was more than intimidating. Like she felt attacked, fearful.[30]

Plaintiff claims that no administrator met with her to discuss these allegations, and

---

[25] *Id.* at p. 4; Deposition of Curry, p. 71, lines 19-21.
[26] *Id.*; Deposition of Curry, p. 71, lines 22-24.
[27] *Id.*; Deposition of Curry, p. 69, lines 13-16.
[28] *Id.*; Deposition of Curry, p. 70, lines 14-21.
[29] *Id.* at p. 5; Deposition of Curry, p. 72, line 3.
[30] *Id.*; Deposition of Curry, p. 72, lines 6-12.

40573

they never disclosed to her these student complaints.[31]  However, Plaintiff does not deny that these incidents took place.  Plaintiff acknowledges that the administration obtained a written complaint in the winter of 2012 purporting to represent the views of Plaintiff's "Junior PK-3 Cohort" complaining that Plaintiff made several offensive comments, such as:  (1) stating that "a woman is thought to be a dike if she wears brown pants"; (2) "it was a choice to be in the program and it was not the fault or problem of the professors if any of us chose to be mommies or wives and not to expect to get an A in the class"; and (3) that Plaintiff used "extreme profanity on a regular basis."[32]  Plaintiff contends "[i]t was never established the letter actually came from a 'cohort' and was not just a random complaint from a disgruntled student."[33]  Further, Plaintiff contends that there is no evidence that this student or cohort was speaking on behalf of anyone other than him/herself.[34]

Curry reported the student complaints to Dean Andrew who subsequently met with Dr. Earl Cheek ("Dr. Cheek"), Director of the College of Education, regarding same.  Curry testified that Dr. Cheek advised that between ten and twelve students had come to his office and reported similar complaints about Plaintiff's behavior and her "talking about sex."[35]  Dr. Cheek further reported that local elementary school administrators had requested that Plaintiff not mentor students on their campuses.  According to Curry, Dr. Cheek claimed he had relayed these complaints to Dean Lindsay (who preceded Dean Andrew) and to Human Resources but was advised nothing could be done because

---

[31] Rec. Doc. No. 36-1, ¶ 48.
[32] *Id.* ¶ 49.
[33] Rec. Doc. No. 35-1, p. 12, n. 5.
[34] Rec. Doc. No. 36-1, ¶¶ 50-51.
[35] Rec. Doc. No. 65-4, p. 6; Deposition of Curry, p. 80, lines 18-19.
40573

Plaintiff was tenured.[36]

## The Investigation

Dean Andrew instructed Curry to gather all information regarding prior complaints, and, while in the process of doing this, Curry was contacted by Cancienne, who advised that Plaintiff was no longer authorized to be on any Iberville Parish school campus.[37] After gathering additional evidence, Curry and Dean Andrew sought help from Human Resources regarding Plaintiff.[38] Human Resources Management administrator Reinoso interviewed witnesses and reported his findings to Dean Andrew, who then recommended to Provost Bell the appointment of a Policy Statement-104 ("PS-104") Faculty Senate Grievance Committee ("the faculty committee").[39]

The PS-104 committee conducted a 12 hour hearing during which several witnesses testified about Plaintiff's classroom behavior, including Plaintiff's friend Karen Donnelly ("Donnelly") who is an adjunct instructor in the PK-3 program. Donnelly testified that she had reported her concerns to Dr. Cheek about Plaintiff's behavior in the Zachary Community School System because Plaintiff's behavior was "threatening our program, and Zachary is our best placement."[40] Donnelly also confirmed that she observed Plaintiff use profanity in the classroom[41] and heard the remarks about which students had

---

[36] *Id.* at p. 7; Deposition of Curry, p. 81, lines 9-14.
[37] *Id.* at p. 8; Deposition of Curry, p. 100.
[38] *Id.* at p. 9; Deposition of Curry, p. 148.
[39] The LSU faculty handbook provides that: "A faculty member (instructor or higher) who feels he or she has a grievance may appeal for a review by appropriate administrators and/or a review by the Faculty Senate Grievance Committee. A grievance is a complaint and/or claim that there has been unfair or unequal treatment by reason of an act or condition that is contrary to established University policy and procedure governing the employer-employee relationship or that there has been a violation, misinterpretation, or inequitable application of University employment policy."
[40] Rec. Doc. No. 34-2, p. 9, Deposition of Karen Donnelly, p. 74, lines 4-7.
[41] *Id.*, Deposition of Donnelly, p. 64.
40573

complained. Donnelly also testified that she knew of complaints from four elementary schools that would no longer allow Plaintiff to mentor student teachers; Donnelly testified to knowledge of complaints about Plaintiff's behavior from Zachary schools,[42] the LSU Lab School,[43] Port Allen Elementary School,[44] and Iberville Parish Schools.[45]

Donnelly confirmed that Reinoso accurately reported that Plaintiff typically makes comments about sex because "that is how she is."[46] When asked what was meant by the comment that Plaintiff had "no self-awareness of what she says,"[47] Donnelly responded: "I'm not sure that was my exact word, but it's like when I said she doesn't have a filter. She just doesn't realize what sometimes she says, and how it sounds. She doesn't mean it the way, you know, it sounds, sometimes."[48] Donnelly also confirmed that she was present when Plaintiff spoke to students about condoms to avoid pregnancy[49] and when Plaintiff advised a student in an assessment meeting about the quality of sex in a relationship.[50] Donnelly testified that she did not believe Plaintiff's behavior was worse than it had always been but that "girls are more vocal nowadays."[51]

On December 20, 2013, Plaintiff was informed by Dean Andrew that she was being removed from the classroom for the Spring 2014 semester while multiple issues were investigated by the Human Resources Department.[52] On January 15, 2014, Plaintiff met

---

[42] *Id.*, Deposition of Donnelly, p. 13.
[43] *Id.*, Deposition of Donnelly, p. 14.
[44] *Id.*, Deposition of Donnelly, p. 70-71.
[45] *Id.*, Deposition of Donnelly, p. 71.
[46] *Id.*, Deposition of Donnelly, p. 63, lines 5-8.
[47] *Id.*, Deposition of Donnelly, p. 75, lines 22-23.
[48] *Id.*, Deposition of Donnelly, p. 75, lines 24-25 through p. 76, lines 1-3.
[49] *Id.*, Deposition of Donnelly, p. 79.
[50] *Id.*, Deposition of Donnelly, pp. 41-42.
[51] *Id.*, Deposition of Donnelly, p. 80, lines 20-22.
[52] Rec. Doc. No. 31-1, pp. 11-12; Deposition of Teresa Buchanan, pp. 200-201; *see also* Rec. Doc. No. 31-1, p. 15 (Exhibit 7 to Deposition of Buchanan).
40573

with LSU Human Resource Management administrators, including Reinoso, to discuss the allegations of complaints by students and school administrators.[53] During the investigation, Plaintiff admitted to using profanity and language of a sexual nature which she claimed supported her "overall pedagogical strategy when teaching at LSU."[54] Plaintiff agreed that, while not a direct quote, she used such language to "get the attention of students" and "loosen them up."[55]

On May 26, 2014, Plaintiff received a memorandum from Reinoso finding her "actions and behavior" to be "inappropriate, unwelcome, and a direct violation of the University's Policy Statements on Sexual Harassment, PS-73 and PS-95."[56] Reinoso further stated: "Beyond your sexually oriented comments, your reported communication style with students, faculty, and outside administrators has been found to be inappropriate, as you often use profanity in your communication."[57] This memorandum led to a June 12, 2014 meeting between Plaintiff and Dean Andrew. Reinoso testified that his role was to determine if Plaintiff's behavior violated policy, but he could not recommend Plaintiff's termination because he lacked the power to do so.[58]

Plaintiff challenges Reinoso's findings, arguing that his report failed to differentiate general allegations against her versus those that constituted harassment. Plaintiff further contends Reinoso's deposition testimony clarified that several allegations against Plaintiff did not support a finding that Plaintiff violated LSU's sexual harassment policy. Plaintiff

---

[53] Rec. Doc. No. 1, ¶¶ 19-20.
[54] *Id.*, Deposition of Buchanan, p. 212.
[55] *Id.*, Deposition of Buchanan, p. 212, lines 10-13. Plaintiff stated that this was not a direct quote but was "correct in content and meaning." *Id.* at lines 21-22.
[56] *Id.* ¶ 20.
[57] *Id.*
[58] Rec.Doc. No. 30-1, p. 4, citing Deposition of Gaston Reinoso, pp. 2-5.
40573

claims that Reinoso's deposition testimony confirms that only the following allegations supported his finding that she violated the sexual harassment policy: (1) Plaintiff's remark to a student about birth control and condoms; (2) Plaintiff's remark to a student that her fiancé was only supportive now because "the sex is good"; (3) the use of profanity in certain contexts; and (4) the allegation that Plaintiff referenced her own sex life in class after she went through a divorce. Plaintiff contends these allegations do not meet the standard of severe, pervasive, or objectively offensive such that she should have been terminated.

Plaintiff claims she was not provided with Reinoso's report, which was endorsed by Monaco and then discussed amongst Reinoso, Monaco, and Dean Andrew, but was only given a shorter, condensed memorandum of findings that did not detail specific allegations against her or identify witnesses.[59] As a result of Reinoso's report, Dean Andrew chose to pursue disciplinary proceedings against Plaintiff and requested that Plaintiff meet with him on June 12, 2014 to discuss the report.[60] During this meeting, Plaintiff claims Dean Andrew provided her a one-page list of the policies she was accused of violating and asked that she respond.[61] Dean Andrew later wrote that Plaintiff "admitted to using profanity and language of a sexual nature, claiming it supported [her] overall pedagogical strategy when teaching at LSU," and that Plaintiff stated something to the effect that such language was used to "get the attention of students" and "loosen them up."[62]

---

[59] Rec. Doc. No. 36-1, ¶¶ 97-98.
[60] *Id.* ¶ 101.
[61] *Id.* ¶ 102.
[62] *Id.* ¶ 104.
40573

In reaction to Plaintiff's response, on June 17, 2014, Dean Andrew advised Plaintiff, in writing, as follows:

> I find this explanation to be unacceptable, and I do not condone any practices where sexual language and profanity are used when educating students, particularly those who are being educated to serve as PK-3 professionals. As a PK-3 faculty member, you are expected to set a good example for your students in the profession, and receiving bans from multiple school districts as a result of your inappropriate behavior does little to support legitimacy in the classroom.[63]

Andrew's correspondence further advised Plaintiff that he was considering pursuing dismissal "for cause" proceedings under LSU policy PS-104.[64]

Plaintiff contends she responded to Dean Andrew on July 1, 2014, advising that she had to contend with "vague and indefinite charges," and that, "[b]efore listening to the context or intention underlying my actions," Dean Andrew at the Human Resources Management team had drawn unfair conclusions that denied her "due process" and resulted in her loss of a promotion.[65] Plaintiff also questioned the reliability of the report findings which she claims "centered on the complaints of a few disgruntled students and answers to leading questions of others, entirely discounting my explanation of the events."[66]

Despite her response, Plaintiff claims she was informed of Dean Andrews' July 14, 2014 recommendation to Provost Stuart Bell that she be dismissed for cause from LSU ten days later on July 24, 2014.[67] On July 30, 2014, Provost Bell requested a PS-104

---

[63] Rec. Doc. No. 31-1, p. 17 (Exhibit 8 to Deposition of Buchanan).
[64] *Id.*
[65] Rec. Doc. No. 36-1, ¶ 107.
[66] *Id.*
[67] Rec. Doc. No. 1, ¶ 33.
40573

proceeding.[68]

Plaintiff alleges she wrote to Provost Bell on August 3, 2014 to reiterate due process concerns and to explain how the complained-of speech was part of her pedagogical strategy:

> "[Profanity] is part of the common vernacular even among very young children today, and teacher-education students need to be aware that they will be confronted with that language and professionally decide how they will respond.  I have never had a student tell me that it was offensive or that they were uncomfortable with my language."[69]

Plaintiff further claims that she:

> informed Bell that she utilizes humor to help student teachers recognize their "own feelings regarding dress and sexuality" to prepare them for their future interactions with "children from family backgrounds that are different from their own" and their responsibility "for establishing and maintaining effective and reciprocal relationships with all families."[70]

Subsequently, Provost Bell impaneled a faculty committee to conduct an evidentiary hearing to determine whether Plaintiff had violated LSU's policies and/or federal law.  Plaintiff acknowledges she was notified of her right, and did in fact exercise her right, to object to any individuals nominated to serve on this committee.[71]  Plaintiff also had notice of two pre-hearing meetings and participated in these meetings with the aid of her legal counsel.[72]   On March 9, 2015, the committee conducted a twelve-hour hearing during which the committee heard testimony regarding Plaintiff's conduct as described above herein.  Plaintiff was given an opportunity to address the committee and

---

[68] *See* Rec. Doc. No. 31-4, p. 9.
[69] Rec. Doc. No. 1, ¶ 34.
[70] *Id.* ¶ 35.
[71] Rec. Doc. No. 31-1, pp. 4-5; Deposition of Buchanan, pp. 80-81.
[72] *Id.*
40573

was allowed to submit exhibits and call witnesses; indeed, all of the witnesses on Plaintiff's witness list testified before the committee except for one released by Plaintiff.[73]

**Procedural Due Process**

Plaintiff contends committee members were not provided with materials or training on how to conduct the hearing or how to interpret the sexual harassment standards set forth in PS-73 and PS-95.[74] Plaintiff notes that the committee chair, William Stickle, testified that he understood the sexual harassment standard to be one of "offensiveness" and that sexual harassment is "in the eye of the beholder."[75] Further, Plaintiff alleges that neither Cancienne nor any of the students who allegedly lodged complaints against Plaintiff testified at the hearing.[76] Rather, Curry and Dean Andrew presented "second and third-hand information they had gathered."[77] Plaintiff also claims she did not receive a copy of the Human Resources Management report until just prior to the hearing.[78]

**The Faculty Committee Findings & Recommendation**

On March 20, 2015, although the committee found insufficient findings to establish an ADA violation,[79] the written findings of the faculty committee concluded that Plaintiff's conduct violated PS-73 and PS-95 "through her use of profanity, poorly worded jokes, and sometimes sexually explicit 'jokes'."[80] The committee further found that Plaintiff's conduct created a "hostile learning environment."[81] Despite these findings, the committee

---

[73] *Id.*, Deposition of Buchanan, pp. 195-196.
[74] Rec. Doc. No. 36-1, ¶¶ 124-125, citing Rec. Doc. No. 35-6, pp. 43-44, Deposition of William Stickle, pp. 48-52.
[75] Rec. Doc. No. 35-6, pp. 47-48, Deposition of William Stickle, pp. 137-138.
[76] Rec. Doc. No. 36-1, ¶¶ 121, 129.
[77] Rec. Doc. No. 35-1, p. 17, citing Rec. Doc. No. 36-1, ¶ 130.
[78] Rec. Doc. No. 36-1, ¶ 123.
[79] *See* Rec. Doc. No. 65-3, p. 26.
[80] Rec. Doc. No. 31-2, p. 14,
[81] *Id.*
40573

did not recommend dismissal but instead recommended a censure and agreement from Plaintiff that she would modify her teaching methodology to correct the offensive behavior.[82] Further, the committee criticized Plaintiff's supervisors for failing to offer her "counseling before HRM engagement" or "re-training prior to implementing PS-104 proceedings."[83] The committee also denounced the "closed nature of the HRM investigation" that "did not offer Dr. Buchanan an opportunity to resolve charges once specifics of charges became known."[84]

Notwithstanding the committee's recommendation, on April 2, 2015, President/Chancellor Alexander notified Plaintiff he intended to recommend her dismissal for cause and for violations of LSU's policies and violation of the ADA.[85] Plaintiff claims Alexander was obligated under PS-104 to "make such a recommendation based on the recommendation of the Committee of the Faculty and the evidence presented in the hearing."[86] However, the same document also states: "The Chancellor also has the option to return the case to the Committee of the Faculty for further review *or to take an alternate action*."[87] Nevertheless, Plaintiff contends Alexander testified that he never reviewed the hearing transcript, did not see any exhibits or evidence presented, and did not know which witnesses testified.[88] Alexander testified that he did read the report of the faculty committee and that he "listened to my staff and the recommendations they made. And those that were involved throughout the hearing as well."[89] Alexander further

---

[82] *See* Rec. Doc. No. 1, ¶ 38; Rec. Doc. No. 14, ¶ 38.
[83] Rec. Doc. No. 36-2, p. 75.
[84] *Id.*
[85] Rec. Doc. No. 31-2, p. 11.
[86] Rec. Doc. No. 35-6, p. 56.
[87] *Id.* (emphasis added).
[88] Rec. Doc. No. 36-1, ¶ 140, citing Rec. Doc. No. 35-5, Deposition of Alexander, pp. 51-56.
[89] Rec. Doc. No. 35-5, Deposition of Alexander, pp. 54, lines 8-11.
40573

testified that his decision was based on his discussions with the Provost and legal staff.[90] Plaintiff also contends that, despite the fact that Reinoso's report confirmed that Cancienne's complaint had nothing to do with sexual harassment, Alexander testified that his recommendation was largely based on Cancienne's complaint,[91] and he "mistakenly believed the case was about more than just profanity, poorly worded jokes, or occasionally sexually explicit jokes."[92]

Plaintiff appealed Alexander's initial recommendation and requested an opportunity to address the Board.[93] Plaintiff was allowed to address the Board;[94] however, Alexander's recommendation remained unchanged.[95] Prior to the Board meeting, Plaintiff communicated with Board members via email and attached her supporting documentation.[96]

Plaintiff has acknowledged that LSU Policy PS-73 defines sexual harassment as:

> speech and/or conduct of a sexually discriminatory nature, which was neither welcomed nor encouraged, which would be so offensive to a reasonable person as to create an abusive working or learning environment and/or impair his/her performance on the job or in the classroom.[97]

Plaintiff further acknowledged that LSU's policy on sexual harassment of students, PS-95 defines sexual harassment as follows:

> unwelcome verbal, visual, or physical behavior of a sexual nature." It

---

[90] *Id.*, Deposition of Alexander, p. 55.
[91] *See id.*, Deposition of Alexander, pp. 152-157
[92] Rec. Doc. No. 35-1, p. 18, citing Rec. Doc. No. 36-1, ¶ 143.  Alexander was asked if this case had only been about profanity, poorly worded jokes, or occasionally sexually explicit jokes, would it have progressed to this level, and he responded:  "This probably would not have progressed to this level."  *Id.*  at p. 163, lines 15-16.  However, Alexander's testimony makes clear that he did not believe the case to be only about those issues.
[93] Rec.Doc. No. 31-1, p. 6, Deposition of Buchanan, p. 176.
[94] *Id.*
[95] Rec. Doc. No. 31-2, p. 18.
[96] Rec.Doc. No. 31-1, p. 3, Deposition of Buchanan, p. 30.
[97] Rec. Doc. No. 1, ¶ 24, quoting Rec. Doc. No. 1-2, p. 2.
40573

includes quid pro quo harassment and hostile environment harassment, which "has the purpose or effect of unreasonably interfering with an individual's academic, work, team or organization performance or creating an intimidating, hostile or offensive working environment.[98]

Plaintiff also acknowledged that PS-95 describes examples of hostile work environment, including "unwelcome touching or suggestive comments, offensive language or display of sexually oriented materials, obscene gestures, and similar sexually oriented behavior of an intimidating or demeaning nature."[99]  However, LSU's policies are much more specific than what Plaintiff has acknowledged.  Indeed, LSU expressly acknowledges that the policies are "not intended to infringe upon constitutionally guaranteed rights nor upon academic freedom."[100]  The policies also include definitions that expound upon what conduct is deemed violative.[101]

Nevertheless, from Plaintiff's selective reference to the policies, she argues that LSU had begun interpreting these policies to mirror what the U.S. Departments of Education and Justice have called "a blueprint for colleges and universities" which defines sexual harassment broadly; however, neither LSU policy nor the "blueprint" implements the standards of Title VII which require actionable sexual harassment to be severe, pervasive, and objectively offensive.  Plaintiff also claims that the Board was not provided with the hearing transcript and exhibits but was instead only given a few items selected by Monaco, including a legal memorandum addressing the constitutionality of LSU's anti-sexual harassment policy.[102]

---

[98] *Id.* ¶ 24, quoting Rec. Doc. No. 1-2, p. 6.
[99] *Id.* at ¶ 25.
[100] Rec. Doc. No. 1-2, p. 2.
[101] *Id.* at p. 3.
[102] Rec. Doc. No. 36-1, ¶¶ 151, 153.
40573

On June 19, 2015, Plaintiff was dismissed by the Board. Plaintiff contends that, in response to her termination, the LSU Faculty Senate adopted a resolution to censure Alexander, Dean Andrew, and Provost Bell, which stated: "great universities have in place three significant measures to ensure the continued observance of academic freedom: Tenure; faculty governance; and due process;" and "all three measures have been violated in the case of Associate Professor Teresa Buchanan."[103]

Plaintiff filed this lawsuit asserting claims pursuant to 42 U.S.C. § 1983 for an alleged violation of her right to free speech and academic freedom under the First and Fourteenth Amendments to the United States Constitution. She also alleges a violation of procedural and substantive due process under the Fourteenth Amendment, a facial challenge to the sexual harassment policies implemented by LSU, and she seeks reinstatement, declaratory, and injunctive relief. The parties have filed cross-motions for summary judgment, which are now before the Court.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[104] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[105] A party moving for summary judgment "must 'demonstrate the

---

[103] Rec. Doc. No. 36-5, p. 145, Faculty Senate Resolution 15-15. The Court notes that this document appears to be Minutes of the Faculty Senate meeting, and the Court cannot determine if this Resolution was proposed or passed.
[104] Fed. R. Civ. P. 56(a).
[105] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
40573

absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[106] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[107] However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[108]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[109] All reasonable factual inferences are drawn in favor of the nonmoving party.[110] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[111] "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint.""[112]

---

[106] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).
[107] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[108] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[109] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[110] *See Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[111] *RSR Corp. v. Int'l Ins. Co*., 612 F.3d 851, 857 (5th Cir. 2010).
[112] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex*., 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
40573

## B. Eleventh Amendment Sovereign Immunity

Defendants contend that the Eleventh Amendment sovereign immunity bars suits against them in their official capacities because "a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office."[113]   Defendants further contend that state officials are not "persons" subject to liability and money damages under 42 U.S.C. § 1983.   Plaintiff does not dispute Defendants' assertion but claims that Defendants have been sued in both their individual and official capacities.   Thus, Plaintiff can recover money damages from Defendants in their individual capacities.   Plaintiff further claims that she seeks only prospective, injunctive relief from the Defendants in their official capacities which does not violate the Eleventh Amendment.

"The Eleventh Amendment to the United States Constitution bars suits in federal court by citizens of a state against their own state or a state agency or department."[114] The State of Louisiana has not waived its sovereign immunity,[115] and the Board of Supervisors, although not named as a Defendant herein, is an arm of the state and is likewise entitled to Eleventh Amendment immunity.[116]   However, the Plaintiff is not barred by the Eleventh Amendment from bringing suit, as she has, for prospective, injunctive relief against individual state officials named as defendants in their official capacities.[117] Further, it is "well established" in the Fifth Circuit that "a suit against a state officer in his or her individual capacity for money damages is not a suit against the state for purposes

---

[113] *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 709 S.Ct. 2304, 2372, 105 L.Ed.2d 95 (1989).
[114] *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 185 (5th Cir.1986).
[115] *See* La. Const. art. XII, § 10; La.Rev.Stat. Ann. § 13:5106.
[116] *Delahoussaye v. City of New Iberia*, 937 F.2d 144, 148 (5th Cir. 1991).
[117] *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
40573

of Eleventh Amendment immunity."[118]

## C. Prescription

Defendants Andrew, Reinoso and Monaco contend all claims against them are subject to dismissal because they are time-barred. The Supreme Court has held that the appropriate statute of limitations to be applied in all Section 1983 actions is the forum state's statute of limitations governing personal injury actions.[119] However, the date that a Section 1983 claim accrues is governed by federal law, not state law. Under federal law, the limitations period begins to run when the plaintiff "becomes aware that [she] has suffered an injury or has sufficient information to know that [she has] been injured."[120] Louisiana law provides a one-year liberative prescriptive period for personal injury claims.[121] Accordingly, Plaintiff was required to have filed suit within one year of the date that she became aware that she has suffered injury or had sufficient information to know that she has been injured.

Defendants rely on the decision in *Van Heerden v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College* wherein the court held that a plaintiff could not use the continuing violation theory for alleged acts of First

---

[118] *New Orleans Towing Ass'n v. Foster*, 248 F.3d 1143, *3 (5th Cir. 2001)(citing *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1271 (5th Cir.1992))("*Pennhurst* and the Eleventh Amendment do not deprive federal courts of jurisdiction over state law claims against state officials strictly in their individual capacities."), *cert. denied*, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993); *Hays County Guardian v. Supple*, 969 F.2d 111, 125 (5th Cir.1992) ("The Eleventh Amendment does not bar state-law actions against state officials in their individual capacity."), *cert. denied*, 506 U.S. 1087, 113 S.Ct. 1067, 122 L.Ed.2d 371 (1993); *Crane v. Texas*, 759 F.2d 412, 428 n. 17 (5th Cir.) ("The Eleventh Amendment is obviously no bar to actions for damages against officials sued in their individual capacities[.]"), *cert. denied*, 474 U.S. 1020 (1985); *see also Hafer v. Melo*, 502 U.S. 21, 30-31, 112 S.Ct. 368, 116 L.Ed.2d 307 (1991)).

[119] *See Wilson v. Garcia*, 471 U.S. 261, 276–80 (1985) (superseded by statute on other grounds); *see also Hitt v. Connell*, 301 F.3d 240, 246 (5th Cir. 2002) (applying state personal injury statute of limitations to First Amendment retaliation claim).

[120] *Helton v. Clements*, 832 F.2d 332, 335 (5th Cir.1987).

[121] *See Bourdais v. New Orleans City*, 485 F.3d 294, 298 (5th Cir. 2007)(internal citation omitted)(citing La. Civ.Code art. 3492).

40573

Amendment retaliation.[122]   The court held:

> As the Fifth Circuit has noted, though, "courts, including this one, are wary
> to use the continuing violation doctrine to save claims outside the area of
> Title VII discrimination cases." *McGregor v. Louisiana State Univ. Bd. of
> Sup'rs,* 3 F.3d 850, 866 n.27 (5th Cir.1993). The Supreme Court has held
> that discrete discriminatory acts constitute separate, actionable instances
> of unlawful discrimination such that the continuing violation theory is
> inapplicable. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).
> Further, as the Court held in *Rutan v. Republican Party of Illinois*, 497 U.S.
> 62 (1990), the First Amendment provides state employees with an
> actionable First Amendment retaliation case for "even an act of retaliation
> as trivial as failing to hold a birthday party for a public employee ... when
> intended to punish her for exercising her free speech rights." 497 U.S. at
> 76, n.8 (internal quotations and citations omitted). Because *Rutan*
> recognizes that instances of retaliation for exercising First Amendment
> rights are almost always actionable, they almost always constitute discrete
> acts which do not admit of aggregation for purposes of pressing a continuing
> violation argument. *See, e.g., O'Connor v. City of Newark*, 440 F.3d 125 (3d
> Cir.2006) (disallowing aggregation of discrete retaliatory acts for purposes
> of statute of limitations when actions related to § 1983 First Amendment
> retaliation claim). Van Heerden has cited no provision of law to the contrary.
> Van Heerden cannot combine separate, discrete instances of First
> Amendment retaliation into a continuing violation for purposes of his § 1983
> claims.[123]

Defendant Andrew notes that Plaintiff makes no allegations against him beyond

July 14, 2014, the date she alleges that Dean Andrew recommended her dismissal for

cause to Provost Bell.[124]  Because this action was taken 18 months prior to Plaintiff's filing

of this suit on January 20, 2016, Dean Andrew contends all First Amendment claims

against him have prescribed.   Defendants Reinoso and Monaco make the same

arguments regarding Plaintiff's allegations against them as no allegations are made as to

Reinoso or Monaco after May 26, 2014 when Reinoso's investigation findings were

approved by Monaco, and Monaco concluded that Plaintiff had violated LSU's sexual

---

[122] No. 03:10-CV-155-JJB-CN, 2011 WL 5008410, *1 (M.D. La. Oct. 20, 2011).
[123] *Id.* at *8.
[124] Rec. Doc. No. 1, ¶ 33.
40573

harassment policies.[125]

The Court agrees that the First Amendment claims brought against Dean Andrew, Reinoso, and Monaco are prescribed.[126]  There is no allegation that Monoco, Reinoso, or Dean Andrew actually terminated Plaintiff.  Further, Plaintiff's attempt to distinguish *Van Herdeen* is without merit and without any jurisprudential support.  The law is clear that she cannot aggregate discrete acts for First Amendment retaliation.  Plaintiff's argument that "Defendants' various actions are part of a single course of conduct that applied an unconstitutional sexual harassment standard and culminated in"[127] her termination is a clear attempt to apply the continuing violation theory to her First Amendment retaliation claim.  Such an argument is foreclosed under applicable jurisprudence.[128]  The First Amendment claims against Dean Andrew, Reinoso, and Monaco are dismissed with prejudice.

### D. Final Decision-Makers

Defendants also move for summary judgment on the grounds that they were not the final decision-makers who terminated Plaintiff's employment.  Defendants note that only the Board is authorized to terminate employees, and Defendants maintain that, since none of them actually terminated Plaintiff, her claims against the Defendants individually

---

[125] *Id.*, ¶ 28; Rec. Doc. No. 30.
[126] Alternatively, the Court finds that Defendants Andrew, Reinoso, and Monaco would be entitled to qualified immunity for the reasons set forth hereafter.
[127] Rec. Doc. No. 35-1, p. 36 (Brief, p. 29).
[128] *See Hamic v. Harris Cnty., W.C. & I.D.* No. 36, 184 Fed.Appx. 442, 447 (5th Cir. 2006) (holding that the continuing violations doctrine does not apply to claims of retaliation because "retaliation is, by definition, a discrete act, not a pattern of behavior"); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)("Discrete discriminatory acts are not actionable if time barred," even when they are related to acts that are the subject of timely complaints."); *Vandenweghe v. Jefferson Parish*, No. 11-2128, 2012 WL 1825300, *6 (E.D. La. May 18, 2012)(court held in case where First Amendment retaliation claims were asserted, "to the extent [plaintiff] seeks redress for injuries known to have been sustained prior to August 25, 2012, the Court finds that these claims are facially time-barred.").
40573

must be dismissed. In support of this argument, Defendants rely on the Fifth Circuit's decision in *Culbertson v. Lykos*, where the court held that, at the time, "[i]t was unsettled...whether someone who is not a final decision-maker and makes a recommendation that leads to the plaintiff being harmed can be liable for retaliation under Section 1983."[129] On the other hand, Plaintiff points out that the *Culbertson* court also stated, referring to a prior similar case: "We did not necessarily hold that there was no individual liability simply because the board made the decision."[130] Ultimately, if the recommendations by the Defendants constitute the reason that the Board terminated Plaintiff, then individual liability could attach.[131]

The decision in *Powers v. Northside Independent School District*[132] is applicable on this issue. In *Powers*, a terminated school principal and assistant principal sued the school district for alleged Section 1983 free speech violations under federal and Texas constitutions. Specifically, these plaintiffs alleged that Superintendent Woods "'used his influence as superintendent' to effect their terminations."[133] After a series of events which included complaints being filed against the plaintiffs relating to their administration of testing, plaintiffs' suspensions for suspected misconduct, and plaintiffs' filing of grievances to contest their suspensions and allege retaliation, Woods recommended to the Board of Trustees that the plaintiffs be terminated.[134] The Board of Trustees followed this recommendation and terminated the plaintiffs' employment.[135] The plaintiffs alleged

---

[129] 790 F.3d 608, 626 (5th Cir. 2015).
[130] *Id.*, citing *Beattie v. Madison County School Dist.*, 254 F.3d 595, 604-605 (5th Cir. 2001).
[131] *See Powers v. Northside Independent School Dist.*, 143 F.Supp.3d 545, 550-51 (W.D. Tex. 2015).
[132] *Id.*
[133] *Id.* at 546.
[134] *Id.* at 547.
[135] *Id.*

40573

in their complaint that Woods "used his authority … as superintendent to create a bogus case for termination against Plaintiffs and, in conjunction with his influence over the Board of Trustees, effected the termination of Plaintiffs' employment by Board action."[136]

Woods challenged the sufficiency of these allegations and argued that such allegations were not actionable because they did not constitute "adverse employment actions" under Section 1983.[137]  Essentially, Woods argued that the plaintiffs "failed to allege that [he] caused their termination."[138]  In reaching its determination on this issue, the court then reviewed Fifth Circuit decisions in two cases relied upon by the Parties in the present case.

> Defendants cite *Beattie v. Madison County School District*, 254 F.3d 595 (5th Cir.2001) (en banc). In *Beattie*, the Fifth Circuit considered the individual liability of Acton, a school principal, and Jones, a school superintendent, who allegedly retaliated against Beattie for exercising her right to free speech by recommending her termination to the school board. 254 F.3d at 604–05. In its discussion affirming summary judgment in favor of Acton and Jones, the *Beattie* court stated Acton and Jones "did not fire Beattie directly, but merely recommended her termination to the board, which made the final decision. If Acton and Jones did not cause the adverse employment action, they cannot be liable under § 1983, no matter how unconstitutional their motives." *Id.* at 605. Here, because only the Board of Trustees had the power to terminate Plaintiffs under Texas law, Defendants claim *Beattie* controls, and therefore that Plaintiffs have failed to state a § 1983 claim against Woods. *See* Mot. Dismiss [# 23] at 10.
>
> The Fifth Circuit, however, recently cast doubt upon Defendants' interpretation of *Beattie* in *Culbertson v. Lykos*, 790 F.3d 608 (5th Cir.2015). In *Culbertson*, two contractors whose company provided breath-alcohol testing services for Harris County brought a § 1983 claim against the Harris County assistant district attorney (ADA) in her individual capacity, alleging First Amendment retaliatory termination. *Id.* at 614, 625. The contractors alleged after they spoke out regarding the unreliability of certain breath-alcohol testing equipment, the ADA pressured the Harris County Commissioners Court, the relevant decision-making body, to terminate their

---

[136] *Id.*at 550.
[137] *Id.*
[138] *Id.* at 549.
40573

contract with Harris County. *See id.* at 621. Considering whether the contractors stated a claim against the ADA in her individual capacity, the *Culbertson* court discussed *Beattie* in detail, noting that "some later decisions ... have interpreted *Beattie* to hold that only final decision-makers may be held liable for First Amendment retaliation under § 1983." *Id.* at 626 (internal quotation omitted).

The *Culbertson* court reviewed the facts of *Beattie*, noting in particular that the board "fired Beattie for permissible, constitutional motives independently of Acton's and Jones's recommendation" and that those permissible motives were a "superseding cause" which "shield[ed] [Acton and Jones] from liability." *Id.* at 625 (quoting *Beattie*). In short, Acton and Jones's unproven retaliatory motives were "displaced by other motives." *Id.*

.  .  .

The *Culbertson* court then pointed to *Jett v. Dallas Independent School District*, 798 F.2d 748, 758 (5th Cir.1986), a pre-*Beattie* decision which required only that a plaintiff show "an affirmative causal link" between the individual actor's conduct and the adverse employment action taken by the decision maker for individual liability to attach. *Culbertson*, 790 F.3d at 626 (quoting Jett, 798 F.2d at 758). The *Jett* court explicitly rejected the individual defendant's "contention that the judgment as to him must be reversed because ... he had only recommending authority." *Jett*, 798 F.2d at 758. Acknowledging the "tension" between *Jett* and the later decisions interpreting *Beattie* to hold that only final decision makers may be held liable for First Amendment retaliation under § 1983, the *Culbertson* court concluded:

> It can at least be said that before [the ADA] could be individually liable despite not being the final decision-maker, it must be shown that her recommendation was made in retaliation for constitutionally protected speech and was the reason the adverse employment decision was made by the final decision-maker. A "superseding cause" would shield [the ADA] from liability.

*Culbertson,* 790 F.3d at 626.

Following *Culbertson*, the Court finds as Plaintiffs have alleged Woods "effected the termination of [their] employment by Board action," they have adequately stated a § 1983 claim for First Amendment retaliation against Woods.[139]

---

[139] *Id.* at 549-550.

40573

While the *Powers* court agreed that the plaintiffs had adequately pled a First Amendment retaliation claim against Woods, the court next addressed the asserted defense of qualified immunity and held as follows:

> Defendants argue Plaintiffs' § 1983 claim against Woods must nevertheless be dismissed because Woods is entitled to qualified immunity for his conduct. The Court agrees. Qualified immunity requires a court to "determine whether the plaintiff has suffered a violation of his constitutional rights and, if so, whether a reasonable official should have known that he was violating the plaintiff's constitutional rights." *Culbertson*, 790 F.3d at 627 (quoting *Murray v. Earle*, 405 F.3d 278, 285 (5th Cir. 2005)). Confronted with the question whether the ADA was entitled to qualified immunity despite its holding the plaintiffs stated a claim against her, the *Culbertson* court found as follows:
>
>> We have already noted ambiguity as to the liability of a person for recommending an adverse employment decision.... It was unsettled at the time of [the ADA's] actions, and remains so now, whether someone who is not a final decision-maker and makes a recommendation that leads to the plaintiff being harmed can be liable for retaliation under Section 1983. *Cf. Beattie*, 254 F.3d at 595, 604–05; *Jett*, 798 F.2d at 758.... In fact, some clear statements in the caselaw have held there can be no liability.
>>
>> We conclude the claims against [the ADA] should be dismissed based on qualified immunity.
>
> *Id.* (additional citations omitted). In light of the foregoing analysis and the *Culbertson* court's statement the law in this area remains unsettled, the Court finds Plaintiffs' claims against Woods should be dismissed based on qualified immunity.[140]

The district court for the Southern District of Texas recently interpreted and applied *Culbertson* in *Sims v. Covington*.[141] The court held that the plaintiff's claim against a supervisor who did not make the final decision to terminate him was foreclosed pursuant to *Culbertson*:

> The threshold and fundamental problem is recent, clear Fifth Circuit

---

[140] *Id.* at 551.
[141] No. H-14-2145, 2016 WL 3144158, *1 (S.D. Tex. June 6, 2016).
40573

precedent that forecloses Sims's claim. In *Culbertson v. Lykos*, 790 F.3d
608 (5th Cir. 2015), the court held that, as of 2015, "[i]t was
unsettled...whether someone who is not a final decision-maker and makes
a recommendation that leads to the plaintiff being harmed can be liable for
retaliation under Section 1983." *Id.* at 627. Because when Covington
allegedly acted, "the law was not clearly established that a mere
recommendation of termination to a higher authority who makes the final
decision causes an adverse employment action" for purposes of First
Amendment retaliation, qualified immunity precludes the relief Sims seeks.
*See id.*

Sims cannot distinguish *Culbertson*. The plaintiff, Amanda Culbertson, like
Sims, alleged that she was fired for asserting her First Amendment rights.
*Id.* at 614–16. Culbertson, like Sims, sought damages under § 1983 from
someone who recommended that she be fired but who did not have the
authority to fire her. *Id.* The Fifth Circuit held that qualified immunity barred
Culbertson's First Amendment claim against the nondecisionmaker. *Id.* at
627. Sims attempts to rely on language from *Culbertson* analyzing the
underlying constitutional violation, *id.* at 625–26, but he ignores the
opinion's qualified-immunity holding, *id.* at 627. (Docket Entry No. 86, Ex. 1
at p. 29). Under *Culbertson*, Sims's claim must fail.[142]

The analysis and reasoning in *Sims* is applicable to the present case.

First, the Court notes that Plaintiff in the present case has not alleged in her

*Complaint* that either Reinoso or Monaco caused or effected her termination.  Indeed,

there is no allegation that either of them even recommended her dismissal.  Thus, any

claims against Reinoso or Monaco for unlawful termination are dismissed as a matter of

law.  Plaintiff does allege that Dean Andrew recommended her dismissal to the Provost,

and that Chancellor Alexander recommended her dismissal to the Board following the

faculty committee hearing.  Reading the *Complaint* in the light most favorable to Plaintiff,

the Court finds that Plaintiff has sufficiently alleged that Andrew and Alexander caused

her termination.  However, the discrete act by Andrew occurred 18 months prior to Plaintiff

---

[142] *Id.* at *5-6.
40573

filing suit and has been dismissed as prescribed.  In any event, both Andrew and Alexander are entitled to qualified immunity for Plaintiff's termination as set forth in *Culbertson* and *Powers* and for the reasons set forth below.

### E.  Qualified Immunity

Defendants also move for summary judgment on claims brought against them in their individual capacities on the assertion of the qualified immunity defense.  Qualified immunity is addressed as a threshold matter, and its elements require an analysis of the substance of each constitutional claim raised.  Qualified immunity protects government officials—from suit under 42 U.S.C. § 1983 and related statutes, including § 1985— performing "discretionary functions" when their actions are reasonable regarding the rights that the official allegedly violated.[143]  Essentially, it is a defense available to "all but the plainly incompetent or those who knowingly violate the law."[144]  The Fifth Circuit uses a two-part test to evaluate qualified immunity defenses: first, whether the defendant's alleged action constitutes a violation of the plaintiff's constitutional rights, and second, "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."[145]  The Court will address each of Plaintiff's alleged constitutional violations below and determine if the defense of qualified immunity has been satisfied for any of these constitutional claims.

### 1.  First Amendment Speech and Academic Freedom

Under Section 1983, a plaintiff must establish the deprivation of a right secured by the Constitution or laws of the United States committed by a person acting under color of

---

[143] *See Good v. Curtis*, 601 F.3d 393, 400 (5th Cir. 2010).
[144] *Id.* (internal citations omitted).
[145] *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007).
40573

state law.[146]  Plaintiff's Section 1983 claim in this case is grounded on the First and Fourteenth Amendments. The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.  A First Amendment retaliation claim requires proof of the following elements: (1) an adverse employment action; (2) speech involving a matter of public concern; (3) the employee's interest in speaking must outweigh the employer's interest in promoting efficiency in the workplace, and (4) the employee's speech motivated the employer's adverse employment action.[147]

The Supreme Court's decision in *Garcetti v. Ceballos*,[148] added a threshold layer to this analysis.[149]  In *Garcetti*, the Supreme Court held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."[150]  Thus, this Court must initially determine whether the Plaintiff's speech was pursuant to her official duties.  Speech that is required by a plaintiff's job duties or part of her official duties is not protected by the First Amendment.[151]  As succinctly stated by the Fifth Circuit in *Davis*: "Activities undertaken in the course of performing one's job are activities pursuant to official duties and not entitled to First Amendment protection."[152]

Therefore, under *Garcetti*, the focus is on the role the employee occupied when she communicated rather than the content of the speech.[153]  "Even if the speech is of

---

[146] *Southwestern Bell Telephone, LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008).
[147] *Charles v. Grief*, 522 F.3d 508, 510, n. 2 (5th Cir. 2008).
[148] 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).
[149] *See Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008).
[150] *Garcetti*, 547 U.S. at 421, 126 S.Ct. at 1960.
[151] *Id.*; *Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d 689, 693-94 (5th Cir. 2007).
[152] *Davis*, 518 F.3d at 313.
[153] *See Williams*, 480 F.3d at 692.
40573

great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties."[154]  Neither a formal job description, speaking on the subject matter of one's employment, or the fact that a public employee's statements are made internally is dispositive.[155]

"Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment."[156]  It consists of "the right of an individual faculty member to teach ... without interference from ... the university administration, or his fellow faculty members."[157]

As the Fifth Circuit has noted, "[w]hile academic freedom is well-recognized, its perimeters are ill-defined and the case law defining it is inconsistent. Its roots have been found in the first amendment insofar as it protects against infringements on a teacher's freedom concerning classroom content and method."[158]  "The foregoing suggests ample precedent for considering academic freedom as within the ambit of the First Amendment, while at the same time demonstrating the nebulousness surrounding exactly what activities are protected by the academic freedom guarantee implied in the First Amendment."[159]

The inquiry into whether Plaintiff's speech is entitled to protection under the First Amendment as addressing a matter of public concern is a question of law for the court to

---

[154] *Id.*

[155] *Id.*; *Garcetti*, 547 U.S. at 423, 126 S.Ct. at 1961.

[156] *University of California Regents v. Bakke*, 438 U.S. 265, 312, 93 S. Ct. 2733, 2759, 57 L.Ed.2d 750 (1978).

[157] *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1275 (7th Cir. 1982) (citations omitted).

[158] *Hillis v. Stephen F. Austin State University*, 665 F. 2d 547, 553 (5th Cir. 1982) citing *Keyishian v. Board of Regents*, 385 U.S. at 603, 87 S. Ct. 675, 683 (other citations omitted).

[159] *Vance v. Board of Supervisors of Southern University*, 1996 WL 580905 at *3 (E.D. La. Oct. 9, 1996).
40573

decide.[160]  The inquiry into whether Plaintiff's interests in speaking outweigh LSU's interests in regulating Plaintiff's speech is a factual determination conducted under the well-known *Pickering* balancing test.[161]  If Plaintiff's interests in the prohibited speech outweigh the College's interests, then Plaintiff's First Amendment rights have been violated.[162]  If the First Amendment violation was a substantial or motivating factor in Defendants' disciplinary action against Plaintiff, Defendants may present evidence that they would have disciplined Plaintiff in the absence of his protected conduct.[163]  However, if Plaintiff's speech does not involve a matter of public concern, it is unnecessary for the court to scrutinize the reason for the discipline.[164]

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."[165]  Speech which can be "fairly considered as relating to any matter of political, social, or other concern to the community" touches upon matters of public concern.[166] Absent unusual circumstances, a public employee's speech dealing with "matters only of personal interest" is not afforded constitutional protection.[167]  However, mixed questions of private and public concern, where the employee is speaking both as a citizen as well as an employee, can be protected,[168] such that "if any part of an

---

[160] *See Rankin v. McPherson*, 483 U.S. 378, 383, 386 n. 9, 107 S.Ct. 2891, 2905, 97 L.Ed.2d 315 (1987).
[161] *See Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).
[162] *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir.1995).
[163] *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977).
[164] *See Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689-90, 75 L.Ed.2d 708 (1983).
[165] *Id.*, at 147–48.
[166] *Id.* at 146.
[167] *Id.* at 147.
[168] *See Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir. 2000), *abrogated on other grounds as stated in Cuvillier v. Taylor*, 503 F.3d 397, 401 n.4 (5th Cir. 2007).
40573

employee's speech, which contributes to the [disciplinary action], relates to a matter of public concern, the court must conduct a balancing of interests test as set forth in *Pickering v. Board of Education.*"[169]

The Court finds that Plaintiff's use of profanity and discussions regarding her own sex life and the sex lives of her students in the classroom do not constitute First Amendment protected speech, are not matters of public concern, and are not, as claimed by Plaintiff, part of her overall pedagogical strategy for teaching preschool and elementary education to students as there is no summary judgment evidence to support such a claim. The Court finds support from the Fifth Circuit's decision in *J.D. Martin v. Parrish*,[170] a case wherein a college teacher brought a Section 1983 action against Midland College alleging that he had been discharged for exercising his First Amendment right to free speech. Martin, an economics professor at Midland, was disciplined after students complained about his constant use of profanity in the classroom. Despite administrative attempts to stop Martin's behavior, he persisted in cursing and ultimately delivered the following "outburst" in class in response to student complaints: "the attitude of the class sucks … is a bunch of bullshit," "you may think economics is a bunch of bullshit," and "if you don't like the way I teach this God damn course there is the door."[171] Upon notice of this outburst, the Dean instituted actions which culminated in Martin's termination. Martin sued under Section 1983 claiming an alleged deprivation of his First Amendment right of

---

[169] *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 411-12 (6th Cir.1994); *see also Connick*, 461 U.S. at 147 (finding that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," no First Amendment protection is afforded to the speech); *Johnson*, 776 F.2d at 451 (finding that the fact that a statement evolves from a personal dispute does not preclude some aspect of it from touching upon matters of public concern).
[170] 805 F.2d 583 (5th Cir. 1986).
[171] *Id.* at 584.
40573

free speech, abridgement of an alleged right of academic freedom, and denials of due process and equal protection.[172]   Although Martin won a jury verdict in his favor on his free speech claim, the Fifth Circuit reversed and noted:  "Some of the jury interrogatories regarding the free speech issue asked for a balancing of Martin's language between its usefulness to his instruction and its disruptive tendency. Such balancing involves a question of law for the court."[173]

The Fifth Circuit noted that "[t]he 'rights' of the speaker are thus always tempered by a consideration of the rights of the audience and the public purpose served, or disserved, by his speech. Appellant's argument, by ignoring his audience and the lack of any public purpose in his offensive epithets, founders on several fronts."[174]   The court held as follows regarding whether Martin's speech was a matter of public concern:

> There is no doubt that Martin's epithets did not address a matter of public concern. One student described Martin's June 19, 1984, castigation of the class as an explosion, an unprovoked, extremely offensive, downgrading of the entire class. In highly derogatory and indecent terms, Martin implied that the students were inferior because they were accustomed to taking courses from inferior, part-time instructors at Midland College. The profanity described Martin's attitude toward his students, hardly a matter that, but for this lawsuit, would occasion public discussion. Appellant has not argued that his profanity was for any purpose other than cussing out his students as an expression of frustration with their progress—to "motivate" them—and has thereby impliedly conceded his case under *Connick*.[175]

The Fifth Circuit further held that, "[r]epeated failure by a member of the educational staff of Midland College to exhibit professionalism degrades his important mission and detracts from the subjects he is trying to teach."[176]   The Fifth Circuit noted

---

[172] *Id.*
[173] *Id.*, n. 1 (citation omitted).
[174] *Id.*
[175] *Id.* at 585.
[176] *Id.*

40573

the trial testimony that Martin's conduct strongly influenced the students in that one student claimed he had "lost interest in economics as a result of Martin's belittling comments," and another student "expressed his reticence to asking questions in class for fear of Martin's ridicule."[177]   Ultimately, the court held:   "To the extent that Martin's profanity was considered by the college administration to inhibit his effectiveness as a teacher, it need not be tolerated by the college… ."[178]   Further, distinguishing jurisprudence on which Martin relied, the Fifth Circuit stated:

> However, we hold that the students in Martin's classroom, who paid to be taught and not vilified in indecent terms, are subject to the holding of *Pacifica*, which, like *Cohen*, recognizes that surroundings and context are essential, case-by-case determinants of the constitutional protection accorded to indecent language. Martin's language is unprotected under the reasoning of these cases because, taken in context, it constituted a deliberate, superfluous attack on a "captive audience" with no academic purpose or justification.[179]

Although not binding, decisions from other federal appellate courts also support the Court's holding.   The Sixth Circuit's decision in *Bonnell v. Lorenzo*[180] is particularly applicable to this case.   The college professor in *Bonnell* was disciplined for his gratuitous in-class use of the words "pussy," "cunt," and "fuck," which had given rise to a sexual

---

[177] *Id.*

[178] *Id.* at 585-86.  The court noted in n 4:  "Our conclusion that a public college teacher's classroom use of profanity is unprofessional and may be prohibited by the school relies on the judgment of the Midland College administrators who testified at trial. As the Supreme Court held in *Board of Education v. Pico*, 457 U.S. 853, 864–65, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982), federal courts should ordinarily decline to intervene in the affairs of the public schools, where the 'comprehensive authority of States and of school officials ... to prescribe and control conduct has historically been acknowledged'. This rule has been enforced in all but the most sensitive constitutional areas. Several Midland College administrators testified on the basis of strong educational credentials and years of experience in their vocation and in the local community. On their shoulders rest the college's educational standards and its utility as a publicly-supported institution. The federal courts thus appropriately respect the professional conclusion of those whose past and future careers depend upon the esteem due to Midland College. 'The determination of what manner of speech in the classroom ... is inappropriate properly rests with the school board.' *Bethel School District No. 403 v. Fraser*, 106 S.Ct. 3159, 3165 (1986)."

[179] *Id.* at 586.

[180] 241 F.3d 800 (6th Cir. 2001).

40573

harassment complaint filed by one of the professor's students.[181]  Because Bonnell's

offensive language was "not germane to the subject matter," the court concluded that he

did "not have a constitutional right to use [these terms] in a classroom setting."[182]

Specifically, the university had issued a warning to the plaintiff as follows:

> Unless germane to discussion of appropriate course materials and thus a constitutionally protected act of academic freedom, your utterance in the classroom of such words as 'fuck,' 'cunt,' and 'pussy' may serve as a reasonable basis for concluding as a matter of law that you are fostering a learning environment hostile to women, a form of sexual harassment. Federal and state law imposes a duty on the College to prevent the sexual harassment of its students and therefore requires that the College discipline you if it finds that you have created a hostile environment.[183]

Despite this warning, the complaints about Bonnell continued.  One student complained

that his comments were "dehumanizing, degrading, and sexually explicit."[184]

In support of its holding, the *Bonnell* court relied on and discussed in detail the

Fifth Circuit's decision in *Martin* and held:

> Plaintiff may have a constitutional right to use words such as "pussy," "cunt," and "fuck," but he does not have a constitutional right to use them in a classroom setting where they are not germane to the subject matter, in contravention of the College's sexual harassment policy. *See id.; see also FCC v. Pacifica Found.*, 438 U.S. 726, 747, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (finding speech that is " 'vulgar,' 'offensive,' and 'shocking' ... is not entitled to absolute constitutional protection under all circumstances"). This is particularly so when one considers the unique context in which the

---

[181] *Id.* at 803.

[182] *Id.* at 820.

[183] *Id.* at 803-04.  The warning continued:  "The principle of academic freedom under the 1st Amendment serves to protect the utterances in question only if they are germane to course content as measured by professional teaching standards. Since the precise frontier between academic freedom and sexual harassment remains to be defined by the courts case by case, a teacher of English literature or composition courses may be able to find safety and comfort under the 1st Amendment only if the words uttered are found in appropriate textual materials and the utterances are pertinent to discussion of those materials. Beyond this point, the teacher enters uncharted territory and proceeds at his or her own risk of being found guilty of sexual harassment. Consequently, you are warned that a general use in the classroom of words like 'fuck,' 'cunt,' and 'pussy' outside a professional exegesis may compel the conclusion that you are creating a hostile learning environment requiring disciplinary action."  *Id.* at 804.

[184] *Id.* at 804.

40573

speech is conveyed—a classroom where a college professor is speaking to a captive audience of students, *see Martin*, 805 F.2d at 586, who cannot "effectively avoid further bombardment of their sensibilities simply by averting their [ears]." *Hill,* 120 S.Ct. at 2489. Although we do not wish to chill speech in the classroom setting, especially in the unique milieu of a college or university where debate and the clash of viewpoints are encouraged-if not necessary—to spur intellectual growth, it has long been held that despite the sanctity of the First Amendment, speech that is vulgar or profane is not entitled to absolute constitutional protection. *See Pacifica*, 438 U.S. at 747, 98 S.Ct. 3026. [185]

The Second Circuit's decision in *Vega v. Miller* is also applicable here.[186]  In *Vega*, a professor terminated by a state college sued college administrators under Section 1983 for violation of his First and Fourteenth Amendment rights.  The administrators moved for summary judgment on the basis of qualified immunity.   The district court held the administrators were not entitled to qualified immunity, and they appealed.    The background facts are as follows:

> In the summer of 1994, Vega taught a six-week composition course at the College's Summer Institute, a program designed for pre-freshmen who need remedial courses prior to matriculation. The students were male and female, aged 17 and 18. On July 21, Vega conducted a free-association exercise called "clustering," in which students were invited to select a topic, then call out words related to the topic, and finally group related words together into "clusters." According to Vega, the exercise is intended to help students reduce the use of repetitive words in college-level essays.

> The students selected "sex" as the topic for the "clustering" exercise. Vega understood the topic to be "sex and relationships." Vega then invited the students to call out words or phrases related to the topic, and he wrote at least many of their responses on the blackboard. The first words called out were, as Vega described them, "very safe words," such as "marriage," "children," and "wedding ring." As the exercise continued, the words called out included "penis," "vagina," "fellatio," and "cunnilingus." Toward the end of the exercise, with all but one of the students yelling and two standing on chairs, the following words and phrases were called out: "cluster fuck,"

---

[185] *Id.* at 819.
[186] 273 F.3d 460 (2nd Cir. 2001).
40573

"slamhole," "bearded clam," "fist fucking," "studded rubbers," "your [sic] so hard," and "eating girls out."[187]

Vega wrote many of the words on the blackboard, but "[a]t no point in the session did Vega seek to curtail the vulgarity of what the students were yelling, or terminate the exercise."[188] None of the students in the class ever complained about this, but it came to the attention of the administrators while investigating another matter.[189]

Vega was confronted about this exercise, and he turned over his lesson plans which included many provocative topics. Vega was advised that the administrators found the exercise inappropriate, and that "it opened the door to bad publicity and possible sexual harassment complaints."[190] Vega was advised that he would not be offered reappointment for the upcoming school year. Vega's contract was officially terminated, and the supporting memorandum explained that Vega's termination was due to his "'reliance on sex as a theme' and 'use of sexually explicit vocabulary' in the clustering exercise."[191] Subsequently, Vega filed suit.

In considering Vega's First Amendment academic freedom claim, the court noted jurisprudence that "serves as a caution to governmental administrators not to discipline a college teacher for expressing controversial, even offensive, views lest a 'pall of orthodoxy' inhibit the free exchange of ideas in the classroom,"[192] but distinguished Vega's conduct finding that "Vega's toleration of the students' shouted vulgarities was far

---

[187] *Id.* at 462-63.
[188] *Id.* at 463.
[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] *Id.* at 467 (citing *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)).
40573

removed from [another plaintiff's] expression of his political views."[193]  The *Vega* court also noted that, while "a teacher may not be disciplined simply because a vulgar word is contained and discussed in assigned materials, at least for students of suitable age, … the vulgarities Vega permitted to be called out in his classroom were not part of an etymological exploration, nor was the scene in which all of the students but one were yelling their contributions, with two standing on chairs, an academic discussion."[194]

The *Vega* court also held that, considering the state of the law at the time of Vega's conduct, the defendants were entitled to qualified immunity for disciplining Vega:

> [T]he Defendants could reasonably believe that in disciplining Vega for not exercising professional judgment to terminate the episode, they were not violating his clearly established First Amendment academic freedom rights. Even though no students complained, what students will silently endure is not the measure of what a college must tolerate or what administrators may reasonably think that a college need not tolerate.[195]

Plaintiff likens her case to *Hardy v. Jefferson Community College*.[196]  In *Hardy*, the Sixth Circuit held that a professor's right to use the words "nigger" and "bitch"  during a classroom discussion on the power of words to marginalize and oppress outweighed the college's interest in regulating offensive speech.[197]  *Hardy* involved the use of controversial words in a class identified as "Introduction to Interpersonal Communication." The students were to examine how language is used to marginalize minorities and other oppressed groups in society.  The lecture included an analysis of words that have historically served the interests of the dominant culture in which they arise.[198]

---

[193] *Id.*
[194] *Id.*
[195] *Id.* at 468.
[196] 260 F.3d 671 (6th Cir. 2001).
[197] *See id.* at 682.
[198] *See id.* at 674-75.

40573

*Hardy* is easily distinguished from the present case.  There is no argument or jurisprudence before the Court which support Plaintiff's claim that using the word "pussy" and "fuck," or discussing her own or students' sex lives and/or reproductive decisions, are relevant to educating students on becoming teachers of preschool through third grade students.  These words and/or discussions are not relevant to the subject matter being taught.  Indeed, even *Hardy* makes clear that academic freedom protects only speech in the context of instructional communication of "an idea transcending personal interest or opinion which impacts our social and/or political lives."[199]  Even in *Vega* and *Cohen*, the objectionable conduct and language was related to the class material and used as part of class assignments.[200]

Applying the Fifth Circuit's decision in *Martin* to the facts of this case, the Court finds that Plaintiff has failed to create a genuine issue of material fact that her comments were in any way related to her pedagogical strategy for teaching preschool and elementary education to future teachers.  Plaintiff has presented no summary judgment evidence that use of the words "pussy," "fuck," and other explicit words are germane to the subject matter being taught.  Discussions of students and/or Plaintiff's sex lives in class is likewise not related in any way to the subject matter being taught.  As found in *Martin*, Plaintiff has offered no evidence that her speech and/or conduct served an academic purpose or justification.

Further, the student complaints herein in many ways mirror those in *Martin* in that Plaintiff's students avoided her class, avoided speaking up in class, and felt embarrassed

---

[199] *Id.* at 679 (internal citations omitted).
[200] This is not to say that instructional speech much occur in the classroom to be protected, but the speech much be related to academic instruction to be afforded constitutional protection.
40573

and/or harassed by Plaintiff's conduct. Dr. Cheek reported that a "cohort" of between ten and twelve students complained that they felt sexually harassed by Plaintiff and submitted a written complaint in 2012 regarding Plaintiff's classroom language and conduct.[201] Curry testified that one student previously discussed felt "attacked" and fearful" following Plaintiff's classroom conduct.[202] Curry testified that, when asked if she wanted to speak to Plaintiff about the incident, this student responded: "I don't want to ever have her as a professor again."[203] Additionally, the fact that Zachary Schools, the LSU Lab School, Port Allen Elementary Schools, and Iberville Parish Schools had either banned Plaintiff from their campuses or requested that LSU not allow her to mentor their student teachers due to Plaintiff's conduct and speech further demonstrates that Plaintiff's conduct and speech served no pedagogical purpose. Rather, the record supports a finding that Plaintiff's behavior and speech interfered with the educational opportunities of her students both in the classroom and in the student teacher or field setting.

Plaintiff has utterly failed to present any summary judgment evidence establishing how her conduct and language related in any way to assignments, instruction, and education of preschool and elementary teachers. The argument that Plaintiff used such language because her students would encounter same by their future preschool through third grade students and parents is unsupported by any record evidence and rejected by the Court as spurious.

For the reasons set forth above, the Court finds that Plaintiff's speech is not protected by the academic freedom exception to *Garcetti* and did not involve a matter of

---

[201] Rec. Doc. No. 65-4, pp. 6-7, Deposition of Curry, pp. 80-81.
[202] *Id.* at p. 5, Deposition of Curry, p. 72, lines 11-12.
[203] *Id.* at p. 5; Deposition of Curry, p. 72, lines 12-14.
40573

public concern. As such, "it is unnecessary for the court to scrutinize the reason for the discipline."[204] Further, it is undisputed that Plaintiff's speech was made while performing her official duties of teaching and supervising student teachers. Plaintiff's argument that the speech was part of her pedagogical strategy is unsupported by evidence and without merit as set forth above.

Even if the Plaintiff's speech were protected, the Court, nonetheless, finds that the Defendants are entitled to the defense of qualified immunity. Based on the clearly established law in place at the time of Plaintiff's conduct, the Court finds that the actions of the Defendants were objectively reasonable. It was objectively reasonable for Defendants Monaco, Reinoso, and Dean Andrew, prompted by complaints from students and the fact that several local schools would not allow Plaintiff to return to their campuses, to conduct an investigation into Plaintiff's conduct, report such findings up the administrative chain, and recommend a due process hearing before a faculty committee. The Court further finds that Alexander's conduct – recommending Plaintiff's dismissal to the Board despite the faculty committee's recommendation for censure – was also objectively reasonable under the facts of this case. LSU policy clearly allows the Chancellor to make his own recommendation irrespective of that of the faculty committee.[205] Accordingly, Defendants are entitled to summary judgment on Plaintiff's First Amendment claims.

---

[204] *Connick*, 461 U.S. at 146.
[205] *See* Rec. Doc. No. 35-6, p. 56.
40573

2. <u>Constitutional Challenge to LSU's Sexual Harassment Policies</u>

Plaintiff also claims that LSU's sexual harassment policies are unconstitutional both facially and as-applied because they are overbroad and lack the necessary objective test for offensiveness. Defendants challenge Plaintiff's standing to seek a declaratory judgment that LSU's sexual harassment policies are unconstitutional pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 and a permanent injunction prohibiting Defendants from enforcing these policies on LSU faculty and students. Defendants also contend LSU's policies are reasonable *per se* for purposes of qualified immunity because the policies are consistent with federal policies on sexual harassment. Defendants maintain that they reasonably believed Plaintiff's speech in violation of the policies was unprotected under the First Amendment. LSU's sexual harassment policies are allegedly consistent with the United States Department of Education's Office of Civil Rights ("OCR") and Department of Justice ("DOJ") "blueprint for colleges and universities throughout the country."[206]

Plaintiff argues she has standing to seek declaratory and injunctive relief against the Defendants because, although she no longer teaches at LSU, and may not return, "the collateral and future consequences of applying PS-73 and PS-95 to her, given the blemish on her record, afford her standing to challenge them."[207]

Plaintiff claims that any regulation of harassment aimed at preventing a hostile educational environment must be drafted and applied with narrow specificity to avoid violating the First Amendment. Plaintiff contends the sexual harassment definitions in

---

[206] *See* www.justice.gov/sites/default/files/opa/legacy/2013/05/09/um-ltr-findings.pdf.
[207] Rec. Doc. No. 35-1, p. 17, n. 21, citing *Esfeller v. O'Keefe*, 391 Fed. Appx. 337, 340 (5th Cir. 2010). 40573

LSU's policies violate the basic constitutional requirements set forth by the Supreme Court's decision in *Davis v. Monroe County Board of Education.*[208] Further, Plaintiff contends LSU's policy definitions are effectively the same as those held unconstitutional by the Third Circuit in *DeJohn v. Temple University.*[209] Relying on the Third Circuit's language, Plaintiff contends that "unwelcome verbal … behavior of a sexual nature," without any requirement of objective offensiveness or interference with a reasonable person's access to his or her education, encompasses any potentially sex-related speech deemed "unwelcome" even if that person is uniquely sensitive. Citing the Supreme Court's decision in *Papish v. Board of Curators of Univ. of Mo.*,[210] Plaintiff maintains that, "[u]nder the First Amendment, a public institution may not broadly ban any sex-related speech based simply on its potential to offend."[211] Therefore, Plaintiff contends that LSU's policies lack the requirement of an objective test for offensiveness and are, thus, unconstitutional.

Plaintiff also contends Defendants' reliance on the OCR/DOJ blueprint is irrelevant as various university speech codes and enforcement actions have been invalidated despite the schools' invocation of their obligation to enforce such rules under civil rights statutes.[212] Plaintiff argues that the OCR/DOJ blueprint upon which LSU relies lacks necessary constitutional safeguards, and "[n]o 'interpretive guidance' from the federal government can alter these constitutional minimums."[213] Plaintiff contends that federal

---

[208] 526 U.S. 629 (1999).
[209] 537 F.3d 301 (3rd Cir. 2008).
[210] 410 U.S. 667, 670 (1973).
[211] Rec. Doc. No. 35-1, p. 18.
[212] *Id.* at p. 19, citing *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 388-89 (4th Cir. 1993); *Saxe*, 240 F.3d at 205-06; *Rodriguez*, 605 F.3d at 709 ("First Amendment principles must guide []interpretation of the right to be free of purposeful [] harassment" in colleges.).
[213] *Id.*, quoting *Miller v. Johnson*, 515 U.S. 900, 923 (1995).
40573

agency interpretations cannot immunize universities against constitutional claims because such pronouncements are only controlling if they do not violate the Constitution. As the Supreme Court has stated, courts cannot "accept the contention that the State has a compelling interest in complying with [] whatever mandates [DOJ] issues."[214]

In addition to challenging the facial constitutionality of LSU's policies, Plaintiff also contends these policies were unconstitutional as applied to her. Plaintiff claims Reinoso did not examine events in context, particularly Cancienne's initial complaints. Plaintiff contends this complaint became a center-piece of the sexual harassment findings although Cancienne was more upset that his school had been criticized and testified that he did not interpret Plaintiff's comments as sexual in nature.[215] Plaintiff further argues that Cancienne's complaint that Plaintiff used the word "pussy" somehow "telephoned" its way into complaints regarding a student who was not present for the utterances, and was then repeated across the sexual harassment findings and recommendations although it was later admitted that Cancienne applied no sexual connotation to the term.[216] Plaintiff maintains Reinoso could have learned of this had he spoken to Cancienne and not relied on what others passed along and his own assumptions.

Plaintiff further claims that most of the statements described in Reinoso's report did not contribute to his ultimate finding because many witness claims were not corroborated and others did not support this finding at all as they had nothing to do with sexual harassment.[217] In fact, Plaintiff contends most of the expletives and colloquialisms

---

[214] *Miller*, 515 U.S. at 922.
[215] Rec. Doc. No. 36-1, ¶¶ 35, 37-39.
[216] *Id.*
[217] *Id.*, ¶ 91.
40573

emphasized by some witnesses admittedly did not constitute sexual harassment.[218] Indeed, most of what was deemed inappropriate did not play a role in the sexual harassment finding. Plaintiff claims that, ultimately, the sexual harassment finding "rested on a handful of scattered, isolated utterances."[219] Thus, Plaintiff contends Reinoso's report "finding" that she committed sexual harassment, based in large part on conduct not considered to be sexual harassment, "snowballed toward[s] Buchanan's dismissal."[220]

Plaintiff contends Dean Andrew relied on Reinoso's faulty report in setting the matter for a PS-104 hearing. Plaintiff further claims that Dean Andrew's memo to the Provost is "a confession not only of intent to fire a tenured professor based on pedagogy and performance, but that the only way he could think of to do so was through LSU's defective sexual harassment policies."[221] Next, she claims the hearing testimony only further advanced the same problematic information. Further, even though the committee found sexual harassment policy violations, it did not recommend termination.

Notwithstanding this recommendation, Plaintiff claims Defendants continued to pursue her termination based on "irrelevant evidence."[222] Plaintiff contends Alexander rejected the committee recommendation "despite having not read the PS-104 hearing transcript, not knowing the definition of sexual harassment the committee used, not understanding the constitutional standard, and generally not knowing what actually happened."[223] What has resulted, Plaintiff contends, is exactly what happens when

---

[218] *Id.*, ¶ 92.
[219] Rec. Doc. No. 35-1, p. 21.
[220] *Id.*
[221] *Id.* at p. 22.
[222] *Id.*
[223] *Id.*, citing Rec. Doc. No. 36-1, ¶ 144.

40573

harassment policies are not sufficiently defined or limited, and it is why she claims her termination was unconstitutional.

        a.  *Policy Language*

LSU Policy PS-73 defines sexual harassment as:

> speech and/or conduct of a sexually discriminatory nature, which was neither welcomed nor encouraged, which would be so offensive to a reasonable person as to create an abusive working or learning environment and/or impair his/her performance on the job or in the classroom.[224]

PS-73 also provides that:

> The intent of his policy is to express the University's commitment and responsibility to protect its employees and students from sexual harassment and from retaliation for participating in a sexual harassment complaint. It is not intended to infringe upon constitutionally guaranteed rights nor upon academic freedom.[225]

PS-73 defines sexual harassment, in part, as follows:

> Sexual harassment is also defined as unwelcome verbal or physical conduct of a sexual nature or gender-based conduct in which the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment. Examples include unwelcome touching; persistent, unwanted sexual/romantic attention or display of sexually oriented materials; deliberate, repeated gender-based humiliation or intimidation, and similar sexually oriented behavior of an intimidating or demeaning nature.[226]

LSU's policy on sexual harassment of students, PS-95, defines sexual harassment as follows:

> Unwelcome verbal, visual, or physical behavior of a sexual nature. It includes quid pro quo harassment and hostile environment harassment, which "has the purpose or effect of unreasonably interfering with an individual's academic, work, team or organization performance or creating

---

[224] Rec. Doc. No. 1, ¶ 24, quoting Rec. Doc. No. 1-2, p. 2 (emphasis added).
[225] Rec. Doc. No. 1-2, p. 2.
[226] *Id.* at p. 3.

40573

an intimidating, hostile or offensive working environment."[227]

Further, PS-95 describes examples of hostile work environments, including "unwelcome touching or suggestive comments, offensive language or display of sexually oriented materials, obscene gestures, and similar sexually oriented behavior of an intimidating or demeaning nature."[228]

       b. *Standing*

Defendants claim Plaintiff lacks standing to challenge the constitutionality of LSU's sexual harassment policies because she has been discharged and cannot be reinstated. Plaintiff relies on the Fifth Circuit's decision in *Esfeller v. O'Keefe*[229] in support of her standing to bring this claim.

In *Esfeller*, a student at LSU filed suit against the Chancellor and Board of Supervisors under Sections 1983 & 1988, seeking a preliminary and permanent injunction against enforcement of LSU's code of conduct. Esfeller had been charged with four non-academic misconduct violations arising from a dispute he had with his former girlfriend, who had filed a complaint with LSU police.[230] The former girlfriend alleged that Esfeller had persistently harassed and stalked her through various social networking sites and that he had physically confronted her.[231]

Esfeller met with a dean regarding the alleged violations, and the dean conducted an investigation which ultimately resulted in Esfeller being found in violation of the code

---

[227] *Id.* ¶ 24, quoting Rec. Doc. No. 1-2, p. 6 (emphasis added).
[228] *Id.* at ¶ 25.
[229] 391 Fed. Appx. 337 (5th Cir. 2010).
[230] *Id.* at 338.
[231] *Id.*
40573

of conduct.[232] Esfeller rejected the sanctions offered by LSU and requested a second investigation.[233] A second dean investigated the matter, and the same result was reached.[234] Esfeller again rejected the proposed sanctions and requested a panel hearing.[235]

The panel hearing resulted in a unanimous finding that Esfeller was in violation of the code. Esfeller appealed this decision to the Vice Chancellor who denied the appeal. Esfeller then sought review by LSU's Chancellor, who also denied the appeal.[236] Esfeller filed suit against Chancellor O'Keefe in his official capacity and the Board, alleging *inter alia* that LSU's code of conduct is facially and as-applied overbroad and vague. The district court denied preliminary injunctive relief, and Esfeller appealed.[237]

The Fifth Circuit first addressed whether Esfeller met the requirements for Article III standing and stated as follows:

> We briefly address whether Esfeller meets the requirements for Article III jurisdiction. *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 413 n. 16 (5th Cir.1999). He is no longer a student at LSU, having been expelled because of a low grade-point average. Further, he has no plans to return to LSU. Mootness goes to the heart of the court's Article III jurisdiction. A case becomes moot if: "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* at 413–14. Standing alone, Esfeller's request for injunctive relief invalidating the offending Code provision is moot. Where a student is no longer enrolled in the school whose policies he is challenging, there is no case or controversy sufficient to support prospective injunctive relief. *See Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 606 (5th Cir.2004); *Hole v. Tex. A & M Univ.*, No. 04–CV–175, 2009 U.S. Dist. LEXIS 123291, at *20 (S.D.Tex. Feb. 10, 2009). Here, however, Esfeller received a disciplinary sanction,

---

[232] *Id.*
[233] *Id.* at 339.
[234] *Id.*
[235] *Id.*
[236] *Id.*
[237] *Id.*
40573

reflected on his academic record and he seeks to prevent the University from enforcing that punishment. **Thus, there are collateral or future consequences sufficient to satisfy the case or controversy requirement**. *Cf. Kennedy v. MindPrint (In re ProEducation Int'l, Inc.),* 587 F.3d 296, 299 n. 1 (5th Cir.2009) (holding that injury to attorney's reputation stemming from disqualification order sufficed to confer Article III jurisdiction for appeal); *see also Sullivan v. Houston Indep. Sch. Dist.*, 307 F.Supp. 1328, 1338 (S.D.Tex.1969). Although, absent the blemish on his academic record, Esfeller would not have a live controversy or standing to challenge the validity of the Code now that he is no longer subject to it, **the sanction is an actual, concrete injury sufficient to satisfy Article III**. *See Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754 (5th Cir.2010). Thus, he can seek to invalidate the Code provisions and enjoin their application because, if successful, Esfeller will no longer be subject to the disciplinary sanction, which would be removed from his record.[238]

For the same reasons as set forth in *Esfeller*, The Court finds that Plaintiff has demonstrated Article III standing to bring the constitutional challenges to LSU's policies. First, she is seeking reinstatement, and second, this has blemished her record and could subject her to collateral injury when she seeks new employment.

### c. *Facial and As-Applied Challenges*

"A facial challenge to a law is 'the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid.'"[239] Although courts generally will pass on facial challenges, there is an exception for First Amendment challenges based on overbreadth.[240]  Courts will consider this doctrine as a last resort and apply it only when "the law may have a chilling effect on the free speech rights of those not before the court."[241]  A facial challenge fails

---

[238] *Id.* at 339-40 (emphasis added).
[239] *Pounds v. Katy Independent School Dist.*, 517 F.Supp.2d 901, 911-912 (S.D. Tex. 2007)(quoting *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).
[240] *Id.*, citing *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999).
[241] *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir.2000) (citing *United Reporting Publ'g Corp.*, 528 U.S. at 38–39, 120 S.Ct. 483)).
40573

when there is no "realistic danger" that the law will "significantly compromise recognized First Amendment protections of parties not before the Court."[242]

"Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face because it also threatens others not before the court - those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid."[243]   Because the application of the overbreadth doctrine is "manifestly strong medicine," before a statute or regulation may be invalidated on its face, the overbreadth must be "substantial."[244] "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds."[245]   The issue for First Amendment purposes is whether the law in question reaches "a substantial amount of constitutionally protected conduct."[246]

In *Esfeller*, the Fifth Circuit noted:

"A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)). The highest level of scrutiny—applied to school regulations that are viewpoint-specific—requires the school to show that the expression would

---

[242] *See Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

[243] Roberts v. Haragan, 346 F.Supp.2d 853, 871 (N.D. Tex. 2004)(quoting *Board of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987)) (internal quotations omitted).

[244] *Id.*, quoting *Board of Airport Comm'rs*, 482 U.S. at 574.

[245] *Board of Airport Comm'rs*, 482 U.S. at 574, quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984)).

[246] *City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987).

40573

"substantially interfere with the work of the school or impinge upon the rights of other students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Thus, for Esfeller's facial challenge to succeed, the overbreadth must be "substantial in relation to the [provision's] legitimate reach." *Hersh*, 553 F.3d at 762.[247]

A First Amendment "as-applied" claim is a challenge to the statute's application to the litigants' own expressive activities.[248] The underlying First Amendment standard for an as-applied challenge is no different than the standard for a facial challenge.[249] However, the Fifth Circuit has noted that "[c]onfusion abounds over the scope of as-applied and other types of First Amendment challenges that a plaintiff can pursue when challenging a statute."[250]

### d. *Application*

Plaintiff relies primarily on several opinions from circuits outside of the Fifth Circuit.[251] Plaintiff relies on the Third Circuit's decision in *Saxe v. State College Area School District* where the court struck down a public school district's anti-harassment

---

[247] *Esfeller*, 391 Fed. Appx. at 341.

[248] *Jornaleros de Las Palmas v. City of League City*, 945 F.Supp.2d 779, 798 (S.D. Tex. 2013)(citing *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 803, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)).

[249] *Id.* (citing *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010)).

[250] *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014)(citing Scott Keller & Misha Tseytlin, *Applying Constitutional Decision Rules Versus Invalidating Statutes In Toto*, 98 Va. L.Rev. 301, 307 (2012) ("The Supreme Court has explicitly acknowledged that there is much confusion over the definitions and attributes of facial, as-applied, and overbreadth challenges."(citing *United States v. Stevens*, 559 U.S. 460, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010)))).

[251] The Court did not locate a Fifth Circuit case directly on point on this issue. The Fifth Circuit has addressed a constitutional challenge of overbreadth to a sexual harassment policy but not in the context of a college setting. In *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995), the court struck down a sexual harassment policy for city police officers stating: "Where pure expression is involved," anti-discrimination law "steers into the territory of the First Amendment." This is especially true because, as the Fifth Circuit noted, when anti-discrimination laws are "applied to … harassment claims founded solely on verbal insults, pictoral or literary matter, the statute[s] impose[] content-based, viewpoint-discriminatory restrictions on speech." *Id.* at 596-97. Nevertheless, *DeAngelis* is a case with very different facts and is not instructive to LSU's sexual harassment policies presented here.

40573

policy for overbreadth.[252]  The anti-harassment policy in *Saxe* provided that:

> Harassment means verbal or physical conduct based on one's actual or perceived race, religion, color, national origin, gender, sexual orientation, disability, or other personal characteristics, and which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment.

> According to state law (18 Pa.C.S.A. § 2709), an individual commits the crime of harassment when, with intent to harass, annoy or alarm another person, the individual subjects, or attempts or threatens to subject, the other person to unwelcome physical contact; follows the other person in or about a public place or places; or behaves in a manner which alarms or seriously annoys the other person and which serves no legitimate purpose.[253]

The *Saxe* court then defined types of harassment in a definitions section. For example, "racial or color harassment" was defined as including "unwelcome verbal, written, or physical conduct directed at the characteristics of a person's race or color ...."[254] There, the Third Circuit first noted that the policy exceeded what is constitutionally permissible under *Tinker* by not only prohibiting speech that led to actual interference of a student's educational environment, but also speech that was merely made with the purpose of causing such disruptions.[255]  Second, the court noted that even if the "purpose" language was ignored, the examples of prohibited "harassment" contained in the policy do not rise to the level of substantial disruption.[256]   Third, the *Saxe* policy prohibited speech that either had the purpose or effect of creating substantial interference or created a hostile educational environment.[257]   The court stated:  "Because the Policy's 'hostile

---

[252] 240 F.3d 200 (3rd Cir. 2001).
[253] *Id.* at 218.
[254] *Id.* at 220.
[255] *Id.* at 217.
[256] *Id.*
[257] *Id.*
40573

environment' prong does not, on its face, require any threshold showing of severity or pervasiveness, it could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone.[258]

However, the *Saxe* court stated:

> We do not suggest, of course, that no application of anti-harassment law to expressive speech can survive First Amendment scrutiny. Certainly, preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest. *See, e.g., Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 549, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). And, as some courts and commentators have suggested, speech may be more readily subject to restrictions when a school or workplace audience is "captive" and cannot avoid the objectionable speech. *See, e.g., Aguilar*, 87 Cal.Rptr.2d 132, 980 P.2d at 871–73 (Werdegar, J., concurring). We simply note that we have found no categorical rule that divests "harassing" speech, as defined by federal anti-discrimination statutes, of First Amendment protection.[259]

The *Saxe* court further stated:

> We do not suggest, of course, that a public school may never adopt regulations more protective than existing law; it may, provided that those regulations do not offend the Constitution. Such regulations cannot be insulated from First Amendment challenge, however, based on the argument that they do no more than prohibit conduct that is already unlawful.
>
> Moreover, the Policy's prohibition extends beyond harassment that objectively denies a student equal access to a school's education resources. Even on a narrow reading, the Policy unequivocally prohibits any verbal or physical conduct that is based on an enumerated personal characteristic and that "has the *purpose or effect* of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment." (emphasis added). Unlike federal anti-harassment law, which imposes liability only when harassment has "a systemic effect on educational programs and activities," *Davis*, 526 U.S. at 633, 119 S.Ct. 1661 (emphasis added), the Policy extends to speech that merely has the "purpose" of harassing another. This formulation, by focusing on the speaker's motive rather than the effect of speech on the learning environment, appears to sweep in those "simple acts of teasing

---

[258] *Id.* at 217.
[259] *Id.* at 209.

40573

and name-calling" that the *Davis* Court explicitly held were insufficient for liability.[260]

The Court finds the *Saxe* case factually distinguishable from the case at bar. First, the harassment policy in *Saxe* is far more broad than LSU's policies as set forth above. The *Saxe* policy contained a catch-all category of "other personal characteristics" upon which one could be harassed that is not present in the LSU policies, and it even prohibited speech directed at one's "values."[261] Thus, *Saxe* is applicable to the issue herein only to the extent that it holds that a "severe or pervasive" requirement should be in a policy.

Plaintiff also relies heavily on another Third Circuit decision, *DeJohn v. Temple University*,[262] and it is the strongest case in her favor. In *DeJohn*, the plaintiff filed suit against Temple University arguing that the following university policy governing sexual harassment was overbroad:

> For all individuals who are part of the Temple community, all forms of sexual harassment are prohibited, including ... expressive, visual, or physical conduct of a sexual or gender-motivated nature, when ... (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or (d) such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment.[263]

The plaintiff complained that, because of the harassment policy, "he felt inhibited in expressing his opinions in class concerning women in combat and women in the military."[264]

---

[260] *Id.* at 210-11 (emphasis original).
[261] *Id.* at 210.
[262] 537 F.3d 301 (3rd Cir. 2008).
[263] *Id.* at 305.
[264] *Id.*

40573

The *DeJohn* court noted: "It is well recognized that '[t]he college classroom with its surrounding environs is peculiarly the "marketplace of ideas [,]"'[265] and '[t]he First Amendment guarantees wide freedom in matters of adult public discourse.'[266] Discussion by adult students in a college classroom should not be restricted."[267]  The *DeJohn* Court began its analysis by explaining that "there is no 'harassment exception' to the First Amendment's Free Speech Clause; that is, 'we have found no categorical rule that divests harassing speech, as defined by federal anti-discrimination statutes, of First Amendment protection.'"[268]  The court found the policy at issue in *DeJohn* overbroad because the policy focused on the motive of the speaker and not just the effect the speech had on the learning environment.[269]  The court reached this conclusion through a careful application of the Supreme Court's ruling in *Tinker*, which requires that a school must show that speech will cause a material or substantial disruption before prohibiting it.[270]  Temple's inclusion of regulation based on the speaker's intent was "contrary to *Tinker*'s requirement that speech cannot be prohibited in the absence of a tenable threat of disruption."[271]

The court stated in particular that the policy's use of the words "hostile," "offensive," and "gender-motivated" is "on its face, sufficiently broad and subjective that they 'could conceivably be applied to cover any speech' of a 'gender-motivated' nature 'the content of which offends someone.'"[272]  Thus, "[a]bsent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and

---

[265] *Id.* at 315, quoting *Healy*, 408 U.S. at 180, 92 S.Ct. 2338).
[266] *Id.*, quoting *Fraser,* 478 U.S. at 682, 106 S.Ct. 3159.
[267] *Id.*
[268] *Id.* at 316 (quoting *Saxe*, 240 F.3d at 210 (footnote omitted)).
[269] *Id.* at 317.
[270] *Id.*; *see also Tinker*, 393 U.S. at 509, 89 S.Ct. 733.
[271] *DeJohn*, 537 F.3d at 317.
[272] *Id.* at 317, quoting *Saxe*, 240 F.3d at 317.
40573

subjectively creates a hostile environment or substantially interferes with an individual's work—the policy provides no shelter for core protected speech."[273]

The court also took issue with the language "unreasonably interefere[s] with an individual's work," stating that it

> probably falls short of satisfying the *Tinker* standard. If we were to construe "unreasonable" as encompassing a subjective and objective component, it still does not necessarily follow that speech which effects an unreasonable interference with an individual's work justifies restricting another's First Amendment freedoms. Under *Tinker,* students may express their opinions, even on controversial subjects, so long as they do so "without colliding with the rights of others." *Tinker*, 393 U.S. at 512, 89 S.Ct. 733. As we observed in Saxe, while the precise scope of this language is unclear, *Saxe*, 240 F.3d at 217, we do believe that a school has a compelling interest in preventing harassment. Yet, unless harassment is qualified with a standard akin to a severe or pervasive requirement, a harassment policy may suppress core protected speech.[274]

It is important to note, however, that the *DeJohn* court did not suggest that all anti-harassment policies violate the First Amendment. Indeed, the Third Circuit has previously emphasized that "preventing discrimination in the workplace—and in schools—is not only a legitimate, but a compelling, government interest."[275] Further, relevant to the present case, the *DeJohn* court suggested that Temple's policy could have provided shelter for protected speech if it "contained a requirement that the conduct objectively and subjectively create[d] a hostile environment **_or_** substantially interfere[d] with an individual's work."[276] The Court also notes that there is a distinction between a

---

[273] *Id.* at 317-18, citing *Saxe*, 240 F.3d at 210–11 (referencing *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 652, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) ("[I]n the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.")).
[274] *Id.* at 319-20 (citations omitted).
[275] *Id.*, citing *Saxe*, 240 F.3d at 210.
[276] *Id.* at 318 (emphasis added).
40573

university's obligation to regulate the classroom speech of its students and that of its faculty. Indeed, the university has a responsibility and obligation to ensure that its students are not being harassed or abused by those it has hired to educate.

The Court acknowledges that the language in LSU's policies is similar to that in the policy at issue in *DeJohn*, but the policies are not exactly the same. Although they lack the exact words "severe" or "pervasive," LSU's policies do inject an objective standard and require a heightened level of offense by the phrase "so offensive to a reasonable person" in PS-73, which is further enhanced by the definitions and examples of prohibited conduct set forth in the policy as quoted above. The definitions and examples set forth in the policy reveal a requirement that the conduct be severe and pervasive.

The Court has also considered the Ninth Circuit's decision in *Cohen v. San Bernardino Valley College*[277] which is, in the Court's view, the most factually analogous to the case before the Court. In *Cohen*, a tenured professor brought a Section 1983 action against public community college officials in response to a student grievance claiming sexual harassment which allegedly violated the professor's First Amendment rights. Cohen taught a remedial English class wherein one student became offended by Cohen's repeated focus on topics of a sexual nature, his use of profanity and vulgarities, and by his comments she believed were directed intentionally at her and other female students in a humiliating and harassing manner.[278] During a particular class, Cohen began a class discussion on pornography and played "devil's advocate" by asserting

_____

[277] 92 F.3d 968 (9th Cir. 1996).
[278] *Id.* at 970.
40573

controversial viewpoints.[279]   Cohen proceeded to give the students an assignment discussing pornography, and the complaining student asked for an alternative assignment.   When Cohen refused to accommodate this request, the student stopped attending Cohen's class and received a failing grade.[280]  The student then complained to the English Department and filed a formal written student grievance pursuant to a new sexual harassment policy implemented by the university.[281]   The Policy in *Cohen* states as follows:

> Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal, written, or physical conduct of a sexual nature. It includes, but is not limited to, circumstances in which:
>
> 1. Submission to such conduct is made explicitly or implicitly a term or condition of a student's academic standing or status.
>
> 2. Such conduct has the purpose or effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, or offensive learning environment.
>
> 3. Submission to or rejection of such conduct is used as the basis for academic success or failure.[282]

The Grievance Committee held a hearing and concluded that Cohen had violated the policy by creating a hostile learning environment.[283]  Cohen appealed this decision to the Board which considered the matter with new hearings.   Both Cohen and the student were represented by attorneys, and each of them testified.   Additionally, several students came forward and testified about the sexual nature of Cohen's teaching material and his

---

[279] *Id.*
[280] *Id.*
[281] *Id.*
[282] *Id.* at 971.
[283] *Id.*

40573

frequent use of derogatory language, sexual innuendo, and profanity.[284]  Ultimately, the Board found Cohen in violation of the policy, ordered him to take specific corrective actions, and warned him that further violation of the policy would result in further discipline "up to and including suspension or termination."[285]

The Ninth Circuit held that the university's policy was unconstitutionally broad and violated Cohen's constitutional rights:

> In this case, the College punished Cohen based on his teaching methods under the provision of the Policy which prohibits conduct which has the "effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, or offensive learning environment." Cohen, admittedly, uses a confrontational teaching style designed to shock his students and make them think and write about controversial subjects. He assigns provocative essays such as Jonathan Swift's "A Modest Proposal" and discusses controversial subjects such as obscenity, cannibalism, and consensual sex with children. At times, Cohen uses vulgarities and profanity in the classroom and places substantial emphasis on topics of a sexual nature.
>
> We do not decide whether the College could punish speech of this nature if the Policy were more precisely construed by authoritative interpretive guidelines or if the College were to adopt a clearer and more precise policy. Rather, we hold that the Policy is simply too vague as applied to Cohen in this case. Cohen's speech did not fall within the core region of sexual harassment as defined by the Policy. Instead, officials of the College, on an entirely ad hoc basis, applied the Policy's nebulous outer reaches to punish teaching methods that Cohen had used for many years. Regardless of what the intentions of the officials of the College may have been, the consequences of their actions can best be described as a legalistic ambush. Cohen was simply without any notice that the Policy would be applied in such a way as to punish his longstanding teaching style—a style which, until the College imposed punishment upon Cohen under the Policy, had apparently been considered pedagogically sound and within the bounds of teaching methodology permitted at the College.[286]

---

[284] *Id.*
[285] *Id.*
[286] *Id.* at 972.
40573

Nevertheless, despite holding the policy unconstitutionally broad, the *Cohen* court explicitly found that the university officials were entitled to qualified immunity in their implementation of the policy. The court held: "The legal issues raised in this case are not readily discernable and the appropriate conclusion to each is not so clear that the officials should have known that their actions violated Cohen's rights. … We AFFIRM IN PART that aspect of the district court's judgment which held that the individual officials were qualifiedly immune."[287]

Further, while *Cohen* is similar to the present case in several ways, it can also be distinguished. Cohen's language, conduct, and assignments were at least tangentially related to the subject matter being taught, and his pornography assignment, while in some views inappropriate and perhaps ill-advised, had an arguable teaching motive and some demonstrative connection to the coursework. The same cannot be said for the conduct and comments of Plaintiff. She repeatedly argues that her conduct and language are part of her pedagogy but has failed to provide the Court any summary judgment evidence which demonstrates sufficient justification or connection between the use of the vulgarities and unwelcome prying into students' sex lives with the teaching of PK-3 education or supervising student-teachers at elementary school campuses. Further, the court found that Cohen was "ambushed" by the student grievance; in the present case, Plaintiff was admonished for her language and behavior at the Iberville school and apparently refused to change, opting instead to simply send others to work with student-teachers off campus. Perhaps the most significant distinction between *Cohen* and the

---

[287] *Id.* at 973.

40573

present case is that LSU's policies include the objective standard "so offensive to a reasonable person," which was lacking in the *Cohen* policy.

The Second Circuit in *Vega*, discussed above, also addressed Vega's constitutional challenge to the college's sexual harassment policy. Vega claimed that the sexual harassment policy implemented against him was unconstitutionally vague and overbroad. The district court ruled that there was a factual issue as to whether Vega was terminated pursuant to the policy and denied summary judgment as to the administrators.[288] The district court distinguished the Ninth Circuit's decision in *Cohen*, finding that "the policy in that case was 'different and narrower' than the one at issue here."[289]

The Second Circuit reversed the district court and held:

> Vega's academic freedom claim asserts that the First Amendment prevented the Defendants from disciplining him for this conduct, and we have ruled above that, whether or not that claim is valid, the Defendants were objectively reasonable in believing that it did not. Since the Defendants have a qualified immunity defense from damages liability for a First Amendment academic freedom violation, it does not matter whether they not only thought that Vega's conduct exceeded the proper bounds of a teacher's classroom conduct but also thought that it violated the College's sexual harassment policy. The conduct remains activity for which they may terminate him without incurring damages liability.[290]

> This is not a case of dual motivation in which a plaintiff contends that adverse action was taken for an impermissible reason, e.g., exercising First Amendment rights by providing information to a radio station, and the defendant contends that the action was taken for a different, permissible reason, e.g., using obscene gestures to correct students. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 281–83 & n. 1, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In such circumstances, if the evidence shows that the impermissible reason was a "motivating factor" of the adverse action, the defendant is liable unless it can show that it would

---

[288] *Id.* at 464.
[289] *Id.* at 465.
[290] *Id.* at 468-69.

40573

have taken the adverse action in the absence of the impermissible reason. Id. at 287, 97 S.Ct. 568. **But where, as here, there is only one conduct of the discharged employee that motivates the adverse action, and a defendant has qualified immunity for taking such action, the immunity is not lost even if the defendant thinks that this same conduct also provides an additional reason for the adverse action**. To take an extreme example, if a teacher ordered a female student to disrobe in front of a class and was fired because the school administrator reasonably concluded that such conduct was not related to a legitimate pedagogical purpose, the administrator would not lose qualified immunity just because of an additional belief that the teacher's conduct also violated the school's sexual harassment policy, no matter how impermissibly vague or overbroad that policy was.[291]

The *Vega* court ultimately followed *Cohen* in granting qualified immunity to the

college administrators:

> In 1996, two years after Vega's termination, the Ninth Circuit held qualified immunity available to college administrators for disciplining a tenured professor for violating a sexual harassment policy that violated the First Amendment. *Cohen*, 92 F.3d at 973. "The legal issues raised in this case are not readily discernable and the appropriate conclusion to each is not so clear that the officials should have known that their actions violated [the professor's] rights." *Id.*; *see also diLeo v. Greenfield*, 541 F.2d 949, 953 (2d Cir.1976) (regulation permitting termination of teacher "for other due and sufficient cause" not unconstitutionally vague or overbroad as applied to teacher who made comments with sexual connotations to students). **Moreover, in view of the vulgarities that Vega permitted to be expressed, no reasonable jury could fail to find that the Defendants would have terminated Vega solely because they considered his conduct beyond the bounds of proper classroom performance, even if the College had no sexual harassment policy**.[292]

As set forth above, the Supreme Court requires that a challenger establish that no

set of circumstances exists under which the policies would be valid. The Court finds that

Plaintiff has failed to carry this heavy burden. First, the Court finds that the LSU policies,

when read together, are not unconstitutionally broad or vague. While the Third Circuit

---

[291] *Id.* at 469 (emphasis added).
[292] *Id.* at 469-70 (emphasis added).
40573

has held there must be something akin to a "severe and pervasive" requirement for a sexual harassment policy to be valid, the Fifth Circuit has not explicitly done so in this context. Further, the Court finds that, while the LSU policies could arguably have been crafted better, the Court does not read the language in LSU's policies to be lacking an objective standard akin to severe and pervasive. The phrase "so offensive to a reasonable person" constitutes a requirement that the conduct be objectively severe, and the definitions and examples set forth in the policy emphasize that the offending conduct must be severe and pervasive as expressed by the words "unwelcome," "persistent," "unwanted," "deliberate," "repeated," "intimidating," and "demeaning."[293] As set forth above, the Plaintiff must establish that there exists no set of circumstances under which this policy would be valid. Plaintiff has failed to carry this burden, and summary judgment is appropriate in favor of Defendants on the facial challenge to LSU's sexual harassment policies.

Plaintiff has likewise failed to establish that LSU's sexual harassment policies are unconstitutional as applied. "While rejection of a facial challenge to a statute does not preclude all as-applied attacks, surely it precludes one resting upon the same asserted principle of law."[294] "In ascertaining the constitutional validity of a restriction on speech,

---

[293] Sexual harassment is also defined as unwelcome verbal or physical conduct of a sexual nature or gender-based conduct in which the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment. Examples include unwelcome touching; persistent, unwanted sexual/romantic attention or display of sexually oriented materials; deliberate, repeated gender-based humiliation or intimidation, and similar sexually oriented behavior of an intimidating or demeaning nature. Rec. Doc. No. 1-2, p. 3.

[294] *Penry v. Lynaugh*, 492 U.S. 302, 354, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Scalia, J., dissenting). *See also RNC v. FEC*, 698 F.Supp.2d 150, 157 (D.D.C.2010) ("In general, a plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the Supreme Court expressly considered when rejecting a facial challenge to that provision. Doing so is not so much an as-applied challenge as it is an argument for overruling a precedent."), *summ. aff'd, RNC v. FEC*, ⸺ U.S. ⸺, 130 S.Ct. 3544, 177 L.Ed.2d 1119 (2010).

40573

the Court must (1) first assess whether the speech deserves protection, (2) then determine the type of forum involved, and (3) finally decide whether the proffered justification for the state's restriction satisfies the appropriate standard."[295]  Because the Court has already held that the challenged speech is not protected by the First Amendment in the classroom setting, Plaintiff's as-applied challenge to the policies as restricting protected speech fails.  Further, LSU's proffered justification for the prevention of sexual harassment and abusive conduct towards its students by faculty members outweighs any interest Plaintiff has in such speech.  The Court finds that the LSU policies are narrowly tailored to promote a substantial government interest such that the policies survive intermediate scrutiny.[296]

In support of her as-applied challenge, Plaintiff primarily contends that even her own accusers did not understand the context of Plaintiff's profanity and language to be sexual in nature.  Plaintiff maintains that the LSU policies' lack of a severe and pervasive requirement failed to put her on notice of what was prohibited conduct.  The Court rejected this argument in addressing Plaintiff's facial challenge, finding that the LSU policies do contain an objective and subjective standard that satisfies this test.  Because Plaintiff's as-applied challenge rests on the same principle of law as her facial challenge, it is denied on the same grounds.

Alternatively, the Court finds that, even if LSU's anti-harassment policies were facially unconstitutional, the Defendants are entitled to qualified immunity for the same reasons set forth by the *Cohen* and *Vega* courts.  Considering Plaintiff's conduct, LSU's

---

[295] *Netherland v. City of Zachary, La.*, 626 F.Supp.2d 603, 606 (M.D. La. 2009)(citing *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)).
[296] *See Horton v. City of Houston*, 179 F.3d 188, 194 (5th Cir.1999).
40573

obligation to protect its students from harassment and abuse, and LSU's obligation to protect its academic and professional reputation in the community, the Court finds that the actions taken against Plaintiff were objectively reasonable under the facts of this case. The record in this case is replete with examples of vulgar and demeaning language and conduct by the Plaintiff. As succinctly stated in *Vega*, in view of the vulgarities and conduct expressed by Plaintiff, "no reasonable jury could fail to find that the Defendants would have terminated [Plaintiff] solely because they considered [her] conduct beyond the bounds of proper classroom performance, even if [LSU] had no sexual harassment policy."[297] Accordingly, summary judgment is granted in favor of Defendants on Plaintiff's constitutional challenges to LSU's harassment policies.

### 3. Alleged Due Process Violations

Plaintiff claims that the investigation, hearing, and termination deprived her of procedural and substantive due process under the Fourteenth Amendment to the Constitution.

#### a. Parties' Arguments

Plaintiff claims that her termination violated her Fourteenth Amendment right to due process. She contends that the "bare recital of steps LSU took"[298] cannot demonstrate the "notice and opportunity to be heard" to which she was entitled as a tenured professor. Plaintiff argues that the charges against her were "never clear, at any stage of the process"[299] because of Reinoso's classification of his "finding" as sexual harassment and how decision-makers thereafter relied on this "finding." Plaintiff claims

---

[297] *Vega*, 273 F.3d at 470.
[298] Rec. Doc. No. 35-1, p. 23.
[299] *Id.*

40573

that, when she met with Reinoso initially, she was questioned but not given specific information regarding the allegations against her or those making the claims.[300] Further, the HRM-EEO findings that were later provided to her consisted only of conclusions and "examples" of "allegations" that summarized the complete findings.[301] Thus, Plaintiff claims that the lack of specificity regarding her alleged wrongs limited her ability to properly defend herself.

As for the final findings, Plaintiff contends such findings lacked any analysis explaining how she violated LSU's sexual harassment policies. Rather, she contends there was only a recap of interviews, a summary, and a bottom-line set of conclusory findings.[302] Plaintiff claims that the one-sided nature of who Reinoso chose to interview, failing to interview Cancienne, Plaintiff's non-complaining students, and other witnesses, asking leading questions and "perhaps browbeating witnesses,"[303] mischaracterizing testimony, and failing to connect the evidence to the conclusions "is fatal to any notion of due process."[304]

Subsequently, Plaintiff contends everything in Reinoso's report was deemed a "finding" of sexual harassment and relied upon in that fashion going forward. Dean Andrew recited a great deal of Reinoso's report in seeking PS-104 proceedings, the faculty committee based its decisions on it as well, and Alexander admitted that he also relied on the report over the committee recommendation. Thus, Plaintiff claims these flawed materials and findings form the basis of the termination recommendation to the

---

[300] SUMF ¶ 78.
[301] Rec. Doc. No. 35-1, p. 31.
[302] *Id.*, citing Rec. Doc. No. 32-2, pp. 80-92.
[303] *Id.*, citing Rec. Doc. No. 36-1, ¶ 76.
[304] *Id.*
40573

Board.

Plaintiff claims none of this information was communicated to her during the investigation, and even once she received the full report, she was forced to guess which allegations implicated sexual harassment and which had been disregarded, depriving her of any opportunity to address these distinctions at any stage before any decision-maker. Plaintiff argues the fact that an explanation from Reinoso only came once he was deposed, many months after Plaintiff's termination, negated her ability to present her side as to specific charges lodged against her.

While Plaintiff acknowledges she received a hearing before the faculty committee and was permitted to appeal, she claims these steps cannot cure a due process violation because "an adjudication … tainted by bias cannot be constitutionally redeemed by review in an unbiased tribunal."[305] Plaintiff claims that bias is demonstrated here because Reinoso failed to particularize what conduct constituted sexual harassment and affected all subsequent levels of the decision-making process. Plaintiff further claims these "inherent deficiencies" are critical and do not constitute the notice and opportunity to be heard guaranteed by the Due Process Clause.[306]

Defendants claim Plaintiff was afforded due process, and summary judgment should be granted in their favor on this claim. Defendants note that Plaintiff has acknowledged that she: (1) was notified of the allegations against her, (2) participated in pretrial meetings, (3) was afforded an evidentiary hearing before the faculty committee,

---

[305] Rec. Doc. No. 35-1, p. 32, quoting *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 333 (9th Cir.1995). The Court notes that the *Clements* case is non-binding and factually distinguishable from the present case.
[306] *Id.*
40573

and (4) was permitted to appeal the committee's findings and recommendations. Specifically, Defendants claim Plaintiff acknowledges the fact that LSU received complaints about her lack of professionalism during her site visit to Iberville Parish schools.[307] Further, Plaintiff acknowledges that her supervisor Dr. Cheek informed her of the initial complaint from Cancienne and requested that she address the complaint, which she did by e-mail.[308] Despite notice of this complaint, and after Plaintiff's ostensible "apology" e-mail to Cancienne, Defendants contend Plaintiff continued to make inappropriate and offensive remarks to the Iberville Parish staff. Rather than modify her behavior, Defendants contend Plaintiff unilaterally decided, without consultation or input from her supervisor, to send other supervisors for education students in Iberville Parish.

As to notice, Defendants refer to the packet received by Plaintiff advising her of the allegations, and Plaintiff's written response thereto, which referenced inappropriate or unwelcome language used in her teaching.[309] Plaintiff's response admits that she was given a "set of complaints" although Plaintiff characterized these complaints as "accusations and allegations that amount to hearsay."[310] Plaintiff's response further consists of denials of specific incidents brought to her attention, specifically a student's right to confidentiality regarding the student's disability status; telling students not to get pregnant while in the program; and regarding the sexual orientation of women who wear brown pants.[311]

Further, Defendants note the undisputed fact that the faculty members of the PS-

---

[307] *See* Rec. Doc. No. 36-1, ¶¶ 16-18.
[308] *Id.*, ¶ 24.
[309] Rec. Doc. No. 36-2, pp. 68-72.
[310] *Id.*, p. 69.
[311] *Id.*, pp. 69-72.

40573

104 committee unanimously determined that Plaintiff violated PS-73 and PS-95 through her use of profanity, poorly worded jokes, and sometimes sexually explicit jokes.[312] The committee found that Plaintiff's behavior, both on and off campus, created a "hostile learning environment."[313] The Defendants maintain that the committee hearing transcript establishes that numerous witnesses testified, and Plaintiff had the opportunity to question those witnesses and present witnesses on her own behalf.[314]

Defendants contend that Plaintiff's unwillingness to modify her offensive behavior, even after she had been notified and asked to address it, is sufficient to establish Plaintiff's notice of the allegations being brought against her, particularly since the nature of the complaints by Iberville Parish is consistent with the complaints LSU received from other sources regarding Plaintiff's conduct. Further, Defendants maintain this series of events establishes that Plaintiff engaged in a pattern of conduct that was addressed and questioned by her supervisor, but she was unwilling to change.

Defendants also argue that Plaintiff's criticism of who investigators chose to interview or not does not amount to a denial of due process. Plaintiff's disagreement with the manner in which the investigation was carried out does not constitute a due process violation but only further illustrates Plaintiff's inability to get along with others and modify her behavior professionally. Defendants also take issue with Plaintiff's challenge to having her teaching duties suspended for the Spring 2014 semester when she unilaterally, without informing her supervisors, removed herself from teaching duties when her behavior was challenged. Defendants maintain that due process was not required

---

[312] Rec. Doc. No. 36-2, pp. 74-76.
[313] *Id.*, p. 75.
[314] Rec. Doc. No. 36-3.
40573

for such an action because they were within the Provost's and Dean Andrew's discretion, and LSU has a responsibility to protect its students and the PK-3 program.

Thus, Defendants contend they have established by summary judgment evidence that Plaintiff was afforded due process. Plaintiff's argument that she did not learn the specifics of the charges until Reinoso was deposed is contradicted by the plethora of documents that she has attached to her pleadings. It is undisputed that Dr. Cheek made Plaintiff aware of the allegations, allowed her a response, and Plaintiff was excluded from several school campuses "long before the PS-104 hearing."[315] Additionally, Reinoso, Curry, and Dean Andrew all testified at the committee hearing, and Plaintiff was permitted to question each of them. When Alexander rejected the committee's recommendation and recommended Plaintiff's termination to the Board, Plaintiff was permitted to appeal to Alexander and appear before the Board before the final decision was made.

### b. *Procedural Due Process*

The United States Constitution provides that, "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Where a tenured public university faculty member is terminated, due process requires both notice and an opportunity to be heard.[316] The type of hearing necessary—the process due—is a function of the context of the individual case.[317] Due Process is not a rigid and fixed concept, but, rather, it is "flexible and calls for such procedural protections

---

[315] Rec. Doc. No. 46, p. 8, citing Rec. Doc. No. 35-6, Ex. 5, pp. 81 & 84.
[316] *Jones v. Louisiana Bd. of Sup'rs of University of Louisiana Systems*, 809 F.3d 231, 236 (5th Cir. 2015)(citing *Texas Faculty Association v. University of Texas at Dallas*, 946 F.2d 379, 384 (5th Cir.1991); *Russell v. Harrison*, 736 F.2d 283, 289 (5th Cir.1984)).
[317] *Id.*

40573

as the particular situation demands."[318]  To determine the requisite process, a court must analyze the "interests at stake in a given case."[319]  *Mathews* provides the three distinct interests to consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[320]

The Court finds that Plaintiff has failed to present summary judgment evidence that there is a material issue of fact as to whether she was denied Due Process in the investigation and hearing that resulted in her termination from LSU.  Considering the record before the Court, the Court finds that Plaintiff was afforded both procedural and substantive due process leading up to her termination.  The record establishes that Plaintiff was given notice of the allegations against her, and the Court finds no lack of specificity, especially in light of Plaintiff's responses.  Further, at every step, Plaintiff was afforded an opportunity to respond to the allegations brought against her.  At the faculty committee hearing, Plaintiff's position was considered, and the committee determined that she violated the sexual harassment policies of LSU.  There is simply no summary judgment evidence that Plaintiff was not afforded proper notice and the opportunity to be heard at a meaningful time and in a meaningful manner, including appealing Alexander's recommendation to the Board.[321]

---

[318] *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).
[319] *Babin v. Breaux*, 587 Fed.Appx. 105, 110 (5th Cir. 2014) (per curiam) (citing *Mathews*, 424 U.S. at 334–35, 96 S.Ct. 893).
[320] *Jones*, 809 F.3d at 236, quoting *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.
[321] At best, one might argue that reasonable minds could disagree on the propriety of Plaintiff's termination; however, that is insufficient to defeat a public official's qualified immunity.  *See State of Tex. By and Through*
40573

### c. *Substantive Due Process*

"Public officials violate substantive due process rights if they act arbitrarily or capriciously."[322] A public employer's decision to terminate a tenured employee's property interest in continued employment is arbitrary or capricious if the decision "so lacked a basis in fact" that it may be said to have been made "without professional judgment."[323] The terminated employee "must show that the decision was 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'"[324]

The standard for establishing a substantive due process violation is "demanding"[325] because "a federal court is generally not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies."[326] "The standard may be even more demanding in the context of higher education personnel decisions because of repeated refusals by the Supreme Court, as well as this court, to 'use the Fourteenth Amendment as an excuse to regulate the internal affairs of public universities.'"[327] Nevertheless, the Fifth Circuit has "also observed that '[t]his measure of judicial restraint ... does not require slavish deference to a university's arbitrary deprivation of a vested property right.'"[328]

---

*Bd. of Regents of University of Texas System v. Walker*, 142 F.3d 813, 819 (5th Cir. 1998)(citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[322] *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 562–63 (5th Cir.2003).

[323] *Mills v. Garcia*, 650 Fed. Appx. 873, 878 (5th Cir. 2016)(quoting *Texas v. Walker*, 142 F.3d 813, 819 (5th Cir. 1998)(internal quotation marks omitted).

[324] *Id.* (quoting *Lewis v. Univ. of Tex. Med. Branch*, 665 F.3d 625, 631 (5th Cir. 2011) (per curiam) (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999))).

[325] *Id.* (quoting *Spuler v. Pickar*, 958 F.2d 103, 107 (5th Cir. 1992)).

[326] *Id.* (quoting *Honore v. Douglas*, 833 F.2d 565, 569 (5th Cir. 1987) (citing *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)))(internal quotation marks omitted).

[327] *Jones*, 809 F.3d at 240, quoting *Tex. Faculty*, 946 F.2d at 385.

[328] *Id.* (collecting cases).

40573

Plaintiff's substantive due process claim of bias is also unsupported by any summary judgment evidence. Plaintiff claims that Reinoso showed bias because he did not interview persons she believed should be interviewed. This does not establish bias for purposes of due process. The United States Supreme Court has held that an employer is entitled to limit his investigation and make credibility determinations in employment situations.[329]

The Fifth Circuit has held that, "the members of an adjudicative body have been found to be unconstitutionally biased in three circumstances:

> (1) where the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) where an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) when a judicial or quasi-judicial decision maker has the dual role of investigating and adjudicating disputes and complaints."[330]

Plaintiff has failed to present summary judgment evidence satisfying any of the above circumstances of bias. While Reinoso did investigate the allegations against Plaintiff and submitted findings, the faculty committee was not bound by these findings, and there is no evidence that Reinoso had any hand in the final decision reached by the committee or Alexander's recommendation to the Board.[331]  The record is devoid of evidence of

---

[329] *See Waters v. Churchill*, 511 U.S. 661, 680 (1994)(holding that a government employer may make credibility determinations and that its failure to interview additional witnesses who would have supported the plaintiff's claim was immaterial as "[m]anagement can only spend so much of their time on any one employment decision").

[330] *Klingler v. University of Southern Mississippi, USM*, 612 Fed. Appx. 222, 231 (5th Cir. 2015)(quoting *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir.1997) (citation omitted)).

[331] Even if Reinoso was considered an "adjudicator," Plaintiff has failed to overcome "strong presumptions of (1) the adjudicators' honesty and integrity and (2) that the decision was made in the public interest." *Id.*, citing *Valley*, 118 F.3d at 1052-53. Plaintiff has offered no evidence that any adjudicator's mind was "irrevocably closed" prior to the adjudication. *Id.*, quoting *Valley*, 118 F.3d at 1052. The Fifth Circuit also stated: "We have further recognized in academic contexts that "a due process hearing is not rendered constitutionally inadequate solely because university administrators are asked to review their own decisions." *Id.*, citing *Tex. Faculty Ass'n v. Univ. of Tex. at Dall.*, 946 F.2d 379, 388 (5th Cir.1991); *see also Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 497, 96 S.Ct. 2308, 49 L.Ed.2d 40573

improper communications or predetermined conclusions by investigators. Plaintiff has offered no evidence of bias other than a decision that runs contrary to her subjective belief, which is not summary judgment evidence.

There is likewise no evidence that the decision to terminate Plaintiff was arbitrary or capricious because Plaintiff has failed to present evidence establishing that her termination lacked a basis in fact or was made without professional judgment. To the contrary, there is abundant evidence in the record, discussed at length above, establishing that Plaintiff engaged in conduct and used speech that violated LSU's anti-harassment policies, and the faculty committee's conclusion confirms this.

On the Plaintiff's claims of procedural and substantive due process violations, the Court is guided by the Fifth Circuit's decision in *Pastorek v. Trail*,[332] a case involving the termination of a tenured professor at LSU's Medical School ("LSUMS"). The plaintiff specialized in the treatment of high-risk pregnancies and performed consultations on patients referred by a local obstetrician.[333] The referring physician came under scrutiny and was subjected to investigatory hearings due to allegations that he was harming patients by over-utilizing high-risk procedures. Based on this development, the Chair of the Obstetrics-Gynecology department at the medical school encouraged the plaintiff not to participate in and support the referring physician's practices.[334] When the plaintiff refused, the Chair sent a formal letter of complaint and recommended the commencement of termination proceedings to the LSUMS's Chancellor, Dr. Mervin L.

---

1 (1976) ("A showing that the Board was 'involved' in the events preceding this decision ... is not enough to overcome the presumption of honesty and integrity in policy makers with decisionmaking power.").
[332] 248 F.3d 1140, 2001 WL 85921 (5th Cir. 2001).
[333] *Id.* at *1.
[334] *Id.*
40573

Trail ("Trail").[335]

The plaintiff was informed of the charges and provided a copy of the Chair's complaint. The plaintiff's obstetrics privileges were suspended, but he was allowed to continue teaching and practicing gynecology pending an investigation and hearing. A committee was appointed to review the charges against the plaintiff, and the committee sought independent review from another physician.[336] This review resulted in a finding that the plaintiff engaged in "very questionable obstetrical practices."[337] In response to this conclusion, the committee recommended further investigation, and Dr. Trail sought independent review by the American College of Obstetricians and Gynecology ("ACOG"). The ACOG found that sixteen of the nineteen consultations that it reviewed were unsatisfactory due to inadequate documentation, and two clearly fell below the standard of care required by a physician.[338]

Following this conclusion, Trail terminated the plaintiff's employment. The plaintiff appealed this decision to the Dean of LSUMS, the LSUMS Standing Appeals Committee, and the President of LSU. The plaintiff lost each appeal and claimed that all of the hearings were biased against him. The LSU Board of Supervisors ultimately ratified the decision to terminate the plaintiff.[339] The plaintiff sued under Section 1983 and alleged that his procedural and substantive due process rights were violated. The district court granted summary judgment in favor of LSU and the LSU defendants, and the plaintiff

---

[335] *Id.*
[336] *Id.*
[337] *Id.*
[338] *Id.*
[339] *Id.*

40573

appealed.[340]

On appeal, the plaintiff argued that the termination proceedings did not afford him due process, specifically because he claimed the defendants did not give him notice of the "actual reasons" for his termination, and the termination hearing was biased.[341] The Fifth Circuit rejected these arguments and held as follows:

> Appellant alleges that he was denied due process because he did not have an opportunity to respond to "the reasons which actually motivated Dr. Trail" to terminate him. In *Levitt v. University of Texas at El Paso*, this court articulated the due process protections to which a tenured professor is entitled. 759 F.2d 1224, 1228 (5th Cir.1985). Included among these protections is the professor's right to "be advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist." *Id.* This notice requirement is satisfied when a professor receives "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495 (1985).

> Prior to terminating appellant, Trail sent a letter informing him of the decision to institute termination proceedings. The letter informed appellant of the charges and requested a written response. These facts are not disputed. This procedure gave appellant notice of the charges and an opportunity to tell "his side of the story." Therefore, Appellant received the notice and opportunity to be heard that due process requires.

> Appellant also argues that the hearing he received was biased because a lawyer participated as an advisor both in drafting the initial charge letter and in the subsequent hearings. Before being terminated, a tenured professor is entitled to a hearing before a tribunal that possesses "an apparent impartiality toward the charges." *Levitt*, 759 F.2d at 1228. However, partiality is not established by the fact that someone participated in the hearing and in the initial investigation. *See Duke v. North Texas State University*, 469 F.2d 829, 834 (5th Cir.1972). For example, in *Duke v. North Texas State University*, this Court rejected plaintiff's argument that the hearing was biased simply because some of those who sat on the panel also participated in the charging phase of the termination proceedings. *See id.* Similarly, appellant argues that the participation of an attorney in the charging and hearing phases of the termination proceedings made the

---

[340] *Id.*

[341] *Id.* at *4.

40573

hearing biased against him. Just as in *Duke*, such participation does not constitute partiality, particularly where, as here, the allegedly partial individual did not participate in the actual decision to terminate. Summary judgment against appellant on his procedural due process claims was appropriate.[342]

The plaintiff also claimed that his substantive due process rights were denied because he was terminated without cause. The Fifth Circuit noted that, to prevail on such a claim, the plaintiff had to show that he had a property interest in his employment and that his termination was arbitrary or capricious.[343] Further, the court stated: "A public employer's termination of an employee does not violate substantive due process unless the determination 'so lacked a basis in fact that their decision to terminate him was arbitrary or capricious, or taken without professional judgment.'[344] The fact that reasonable minds could disagree on the propriety of the decision is insufficient to defeat a public official's qualified immunity."[345] The Fifth Circuit rejected the substantive due process challenge, finding as follows:

> In this case, Dr. Gary Cunningham, a physician not associated with LSUMS, determined that appellant engaged in "questionable obstetrical practices." An independent review by the ACOG resulted in a finding that, in two cases, appellant's care fell below the standard required of a physician. The ACOG also found that appellant's performance was unsatisfactory in another sixteen cases because of inadequate medical record documentation. Appellant was provided a hearing, an opportunity to defend himself, and several appeals. Appellant may not agree with Dr. Cunningham's or the ACOG's findings, but it cannot be said that the decision to terminate him lacked a basis in fact. Further, the extensive proceedings afforded appellant show that the decision to terminate him was not made arbitrarily or capriciously. Therefore, neither Trail nor Elkins violated appellant's substantive due process rights and summary judgment in their favor on this issue was appropriate.[346]

---

[342] *Id.*
[343] *Id.*, citing *State of Texas v. Walker*, 142 F.3d 813, 819 (5th Cir.1998).
[344] *Id.* at *5, quoting *Walker*, 142 F.3d at 819.
[345] *Id.*, citing *Walker*, 142 F.3d at 819.
[346] *Id.*

40573

No different result is mandated in the present case.

The Court is mindful of the Fifth Circuit's decision in *Honore v. Douglas*, wherein the Court found procedural adequacy but reversed the district court's grant of summary judgment on the substantive due process claim where the committee "unanimously recommended tenure," but the university president rejected such a recommendation.[347] Although in the present case, President Alexander rejected the faculty committee's recommendation to retain and censure Plaintiff rather than terminate, the faculty committee was also unanimous in finding that she had violated both of LSU's sexual harassment policies.  Further, President Alexander was within his rights to reject the committee's recommendation and present his own recommendation to the Board, as long as such a recommendation was not arbitrary or capricious.  Another important distinction is that, in *Honore,* unlike the present case, the plaintiff presented sufficient evidence to show that his speech criticizing a graduate school's admission policy was a matter of public concern.[348]  In light of the nature of the charges brought against Plaintiff, the committee's findings, and the fact that Plaintiff had an opportunity to address the Board before it decided to adopt Alexander's recommendation, the Court cannot find that the decision to terminate Plaintiff was arbitrary and capricious, and the Court finds that the circumstances are factually distinct from those in *Honore*.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's due process claims.

---

[347] 833 F.2d 565, 567-70 (5th Cir. 1987).
[348] *Id.* at 567, 569.

40573

III.    **CONCLUSION**

For the reasons set forth above, Defendants' *Motion for Summary Judgment*[349] is

GRANTED, and Plaintiff's *Motion for Summary Judgment*[350] is DENIED.  Plaintiff's claims

are dismissed with prejudice.

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>January 10, 2018</u>.


_____

**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[349] Rec. Doc. No. 30.
[350] Rec. Doc. No. 35.
40573